[No. S004769. Apr. 29, 1991.]

THE PEOPLE, Plaintiff and Respondent, v.
GEORGE HERBERT WHARTON, Defendant and Respondent.

524

536

**COUNSEL**

Horace N. Freedman for Defendant and Appellant.

Munger, Tolles & Olson, Bradley S. Phillips, Livingston & Mattesich, James M. Mattesich, Dickstein, Shapiro & Morin, Kenneth L. Adams, Keck, Mahin & Cate, Steven L. Engelberg, Robert Cohen and Richard S. Leslie as Amici Curiae on behalf of Defendant and Appellant.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Richard B. Iglehart, Chief Assistant Attorney General, Edward T. Fogel, Jr.,

Assistant Attorney General, Donald E. De Nicola, Jennifer S. Cady and Robert D. Breton, Deputy Attorneys General, for Plaintiff and Respondent.

---

## OPINION

**LUCAS, C. J.**—George Herbert Wharton was convicted in 1986 of the first degree murder of Linda Smith. After being advised of and waiving his constitutional rights, he admitted the truth of a single special-circumstance allegation charging a prior conviction of second degree murder. (Pen. Code, § 190.2, subd. (a)(2); all further statutory references are to this code unless otherwise indicated.) He also admitted having suffered various prior felony convictions. (§§ 667, subd. (a), 667.5, subd. (b).) A Santa Barbara County jury set the penalty at death. This appeal is automatic. (§ 1239, subd. (b).) We affirm.

FACTS

*Guilt Phase*

In response to a telephone call, Officer Rivas went on February 27, 1986, to the home of Linda Smith and defendant around 5:30 or 6 p.m., in an attempt to locate Smith. Rivas knocked on the door but received no answer. He observed a package addressed to Smith in the mailbox. Mrs. Lopez, a neighbor, reported having last seen Smith about two weeks before. Rivas procured a ladder, hoisted himself up to the balcony and looked into the apartment, announcing his presence and identifying himself as a police officer. Noticing an open window, he removed the screen and entered the apartment. Finding no one at home, Rivas left a note for Smith and exited the apartment, locking the door behind him. After learning from a neighbor that the apartment contained an attic, Rivas, this time accompanied by Officer Garcia, reentered the apartment and searched the attic but found no trace of Smith. In the kitchen, however, both officers noticed a large cardboard barrel with a plastic bag over the top. Although they shook the barrel, they did not search it. Neither officer had a warrant authorizing these entries.

About 10 o'clock that night, Sergeant Zuniga spoke to Smith's aunt, Mrs. Fechtner, who expressed concern for her niece's safety. Zuniga went to Smith's apartment and observed that the apartment was dark and that there was mail in the mailbox. In addition, the officer noticed Smith's car was not in the driveway or the immediate neighborhood. Because Officer Rivas had

left a note inside the apartment, however, Zuniga did not attempt to contact anyone at the residence. Zuniga left the residence about 11:10.

Also around 10 p.m., Iris Short, another neighbor, heard a loud thumping noise on Smith's front door and then someone running up the stairs. When she looked out, she saw the silhouette of someone standing in front of the door. After talking to Mr. and Mrs. Lopez, she called the police. Officers Fryslie and Tracy responded to the call about 11:25. Receiving no answer to their knock, they tried the door and found it unlocked. After announcing their intention to enter the apartment, the officers entered. Although there was no one in the apartment, the officers found what appeared to be a suicide note. Encountering the barrel, Fryslie felt part of the plastic covering that protruded; the contents felt soft and pliable. He then called Sergeant Zuniga and informed him that he may have found a body disposal site. Cutting open the bag inside the barrel, they found Smith's body. The officers immediately ceased their search and left to obtain a search warrant.

The warrant was obtained, executed the next morning (February 28th), and the body was removed. A search of the apartment uncovered, among other things, several empty prescription drug bottles and a note pad with a note that began, "Dear Dr. Hamilton." While most of the bottles bore the victim's name, one bore defendant's name. In addition, police found a toolbox in the garage.

An autopsy revealed the victim had been struck three times on the head with a blunt instrument, probably a hammer. The victim received one direct blow and two glancing blows. Any of the blows would have caused instant unconsciousness. Although the victim had no other broken bones or lacerations, the presence or absence of defensive wounds such as bruises could not be determined because of the advanced state of decomposition of the body. Dr. Failing, the pathologist in charge of the autopsy, testified that in his opinion, the victim died of asphyxia rather than the cerebral contusions. Because of the condition of the body, Dr. Failing could not pinpoint the time of death but opined it was probably 10 to 14 days earlier.

Police located defendant that morning in a restaurant, but he fled when police arrived. After a brief search, police found him hiding under a truck and took him into custody.

Defendant waived his *Miranda* rights (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]) and agreed to speak with Officer Tonello. Defendant stated that he lived with Smith and that he spent the night of February 26th with her in their home. He affirmed

that Smith was alive that night. He eventually admitted, however, that they argued and that he killed her. He explained that they had been drinking heavily that night and began to argue.[1] She threw a book at him and he hit her twice in the head. She may have hit her head on a table, but he was not sure. He admitted he was mentally aware he was hitting her but stated that he was in a rage. He eventually realized she was dead. He began writing a letter to his psychotherapist, Dr. Hamilton, and then took several pills and lay down beside Smith. He tried to kill himself by inhaling gas from the oven. He did not know what he intended to do with the body, moving it from room to room. He also stated he lit a fire in the fireplace and brought Smith's body into the room to keep her "warm." At one point, he held Smith's body to his own. He eventually wrapped Smith's body in blankets and plastic bags and placed it in the barrel, where it was found by police.

Leighton Smith, the victim's ex-husband, was sorting through the victim's belongings after defendant was taken into custody. Although police had already searched the house, Leighton Smith contacted police when he discovered a hammer lying under a daybed. He also noticed many of the victim's possessions were missing, including coins, furs, jewelry, china, a television, a camera, a microwave oven, and a stereo.

There was evidence that, in order to buy cocaine, defendant sold the victim's property after, and possibly before, her death. He bartered away her car to Albert and Americo Perez for a quarter gram of cocaine plus a promise of more cocaine in the future. The Perez brothers sold the car in Mexico but agreed to retrieve it and testify against defendant in exchange for a grant of immunity. Sandra Barney testified that she helped defendant cash some of the victim's checks; on at least two occasions, she saw him write the victim's name on a check. She also testified that they used the money from the checks to buy drugs and alcohol and that defendant tried to sell the victim's jewelry. Jackie Dennis testified that defendant gave her some women's clothes and jewelry to sell and asked if she knew anyone who wanted to buy some dishes.

In addition, defendant's two psychotherapists testified and related various inculpatory statements defendant made in therapy. (See discussion, *post*, p. 549 et seq.) Defendant did not present an affirmative defense.

*Penalty Phase*

The prosecution's case at the penalty phase of the trial consisted of evidence of defendant's prior felony convictions. In June 1975, 61-year-old

---

[1] There was evidence that both defendant and the victim regularly abused alcohol, marijuana, and cocaine.

Jane B. answered her doorbell and found defendant, a neighbor, on her doorstep. He indicated he had been fighting with his wife and asked to use Jane B.'s telephone. She told him it was too late to let him in but made up a package of cosmetics to give to defendant for his wife, thinking it would cheer her up. When she opened the door to hand the package to him, defendant forced his way in and, armed with a butcher knife, forcibly raped her. During the crime, defendant held the knife to her throat, told her he would kill her if she screamed or made any noise, and made several small, shallow cuts on her neck. Defendant told her that if she reported the crime, he would return and kill her. He also threatened to firebomb her house. After defendant left, Jane B. discovered some money, a small radio, and a camera were missing. She testified at defendant's subsequent rape trial that the ordeal was extremely painful and that it left her vaginal area bloody.

After his arrest for rape, defendant admitted he raped and robbed Jane B. but denied making the cuts on her neck. During his interrogation, defendant also admitted killing Robert Pierce after the latter solicited a homosexual act from him. Defendant said he kicked Pierce and continued to kick him after he fell down. Before leaving the scene, he took Pierce's watch. The prosecution's evidence showed that in February 1975, Santa Barbara police found the body of Pierce, a university professor, lying in a doorway. Although they initially believed the death was accidental, an autopsy revealed facial and other injuries inconsistent with the accidental death theory. Defendant eventually pleaded guilty to second degree murder and rape.

In addition to this evidence, the prosecution introduced evidence of defendant's prior convictions for burglary and receiving stolen property.

In the defense portion of the penalty phase, defendant called Dr. Judith Hamilton to the stand. She testified that defendant voluntarily sought treatment from her because of headaches, restlessness, and feelings of nervousness around people. He also had a fear of hurting his girlfriend, victim Linda Smith. Defendant reported he had abused several drugs in the past, including cocaine, amphetamines, marijuana, and alcohol. In addition, he told her that he hated his father and grandfather, that his grandfather beat him with branches and scraps of wood, and that he was sexually abused by his mother's friend when he was 11 years old. Defendant also revealed he had attempted suicide on three different occasions, the most recent being a month earlier. Dr. Hamilton diagnosed defendant as suffering from atypical impulse control disorder and multiple drug or substance abuse. She could not determine on the basis of her sessions with defendant whether she could rule out paranoid schizophrenia and organic personality disorder as possible diagnoses.

Claudia Ann Wharton, defendant's sister, described his childhood. The family, including defendant, moved to his maternal grandmother's farm in Hammond, Louisiana, after defendant's parents separated. His mother worked as domestic and received welfare benefits. David Lee, defendant's stepgrandfather, was a six-foot, five-inch, three-hundred-pound man known as "Big Daddy" and was the father figure on the farm. Lee did not like defendant. Lee would beat defendant with a leather strap or an oak branch whenever defendant displeased him. Defendant carried a heavier share of the chores than did the other children. Defendant's mother often quarreled with Lee; when he became angry, Lee would sometimes turn off the family's water or refuse them wood to burn in the winter. Defendant's mother had a drinking problem during defendant's childhood years. When defendant was 16, he left home and entered the Job Corps.

Claudia also testified that defendant was a changed man after he was released from his first term in prison. He was anxious in crowds and had headaches. She stated that defendant told her he did not kill Pierce or rape Jane B. He also told her his wife had a miscarriage the night Jane B. was raped.

Pearl Wharton, defendant's mother, testified that she left home at age 11 when Lee tried to molest her. She married defendant's father, George Wharton, when she was 22 years old and their marriage lasted about 30 years. Defendant's father drank and occasionally physically abused her. After the family moved back to her mother's farm, Lee mistreated defendant, beating him with oak switches. On one occasion, she argued with Lee after he whipped one of her daughters with an extension cord. When Lee struck defendant's mother with a broomstick, defendant picked up a stick to defend her. Lee produced a gun and defendant ran away.

Linda Wharton, another of defendant's sisters, essentially corroborated Claudia and Pearl Wharton's description of defendant's childhood years. She speculated that Lee punished defendant because he looked like his father, a man Lee disliked. She also recalled that on one occasion, when defendant was 12 or 13 years old, Lee placed him in a burlap sack, dangled it from a tree branch with a rope, and then set a smoldering, smoky fire under the sack. Defendant was left in the sack for hours.

Dr. Donald Patterson, a psychiatrist, examined defendant at the request of the defense. He concluded defendant suffered from a personality disorder, a substance abuse disorder, and possibly paranoid schizophrenia. In addition, he noted that at the time of the crime, defendant was under severe stress which may have led to a brief reactive psychosis, i.e., a brief interruption of contact with reality because of some significant event or stress. This

would explain defendant's unusual behavior following the slaying, that is, moving the victim's body from room to room and building a fire to keep her "warm." Patterson stated that although "atypical impulse disorder" (Dr. Hamilton's diagnosis) was a possibility, he was less comfortable with that diagnosis.

Dr. Patterson concluded by stating that, in his opinion, defendant was under the influence of extreme mental or emotional disturbance at the time he committed the crime because of the dysfunctional relationship he had with the victim. In addition, Patterson believed that defendant reasonably believed there was moral justification for his conduct and that he acted under extreme duress or under the substantial domination of another person. He reached these latter conclusions in light of evidence showing defendant suffered auditory hallucinations and may have killed in response to "voices" he heard inside his head.

DISCUSSION

*Guilt Phase*

1. *Sufficiency of Evidence of Premeditation and Deliberation*

█ Defendant contends there is insufficient evidence of premeditation and deliberation to support the jury's first degree murder verdict. Although defendant relies heavily on the circumstances of the crime—as he described them in his confession to Officer Tonello—to conclude there was insufficient evidence of premeditation, there was other evidence from which a rational trier of fact could have concluded defendant premeditated before killing. █ This latter evidence was admittedly not overwhelming, but "we need not be convinced beyond a reasonable doubt that defendant premeditated the murder[]. The relevant inquiry on appeal is whether ' "*any* rational trier of fact" ' could have been so persuaded." (*People* v. *Lucero* (1988) 44 Cal.3d 1006, 1020 [245 Cal.Rptr. 185, 750 P.2d 1342], quoting *People* v. *Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255], and *Jackson* v. *Virginia* (1979) 443 U.S. 307, 318-319 [61 L.Ed.2d 560, 573, 99 S.Ct. 2781], italics in original.)

█ As in past cases, we rely on the tripartite test first set forth in *People* v. *Anderson* (1968) 70 Cal.2d 15 [73 Cal.Rptr. 550, 447 P.2d 942]. Accordingly, we determine whether there was evidence of (1) defendant's planning activity prior to the homicide; (2) his motive to kill, as gleaned from his prior relationship or conduct with the victim; and (3) the manner of killing, from which may be inferred that defendant had a preconceived design to kill. "[T]his court sustains verdicts of first degree murder typically when

there is evidence of all three types and otherwise requires at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3)." (*Id.* at p. 27.)

 In asserting there was no evidence of planning activity, defendant points to his confession, which tends to paint a picture of a killing during a spontaneous and uncontrolled explosion of anger, frustration, and rage. As the prosecutor argued in his closing summation, however, the fact that the hammer—the likely murder weapon—was not found in the toolbox suggests defendant may have removed it ahead of time and placed it nearby, "planning to be in a rage." (See *People* v. *Martinez* (1987) 193 Cal.App.3d 364, 372 [238 Cal.Rptr. 265].) This possibility was given some support by the testimony of defendant's psychotherapists that he was seeing them because he was afraid he would strike Smith.

Another possible scenario raised by the prosecutor in closing argument is that defendant and Smith quarreled, he became angry, went to the garage to obtain the hammer with the intent to kill Smith with it, came back and struck her as she slept. (There was evidence she was not standing when struck.) As the prosecutor properly informed the jury, "premeditation can occur in a very short period of time." (*People* v. *Bloyd* (1987) 43 Cal.3d 333, 348 [233 Cal.Rptr. 368, 729 P.2d 802]; *People* v. *Velasquez* (1980) 26 Cal.3d 425, 435 [162 Cal.Rptr. 306, 606 P.2d 341].) Under this version, defendant's act of retrieving the hammer would constitute planning activity.

Either version of the actual crime is indicative of planning activity and reasonably inferable from the evidence. Although both are inconsistent with the circumstances of the crime as related by defendant to Officer Tonello, the jury was entitled to disbelieve defendant's self-serving statements, especially in light of the fact that he was less than forthcoming during that critical interview, at one point sarcastically directing Tonello to "do some detective work. That's what you're there for, you know." Defendant was also somewhat inconsistent in his description of the killing, at one point saying he might have strangled Smith in addition to striking her on the head, but that he was not sure. Under these circumstances, the jury's decision to disbelieve his story was not unreasonable.

The prosecutor also identified a plausible motive for the slaying. (See *Lucero, supra*, 44 Cal.3d at p. 1019 ["plausible" motive found].) The evidence clearly showed that defendant sold some of Smith's belongings after her death and there was evidence from which the jury could have reasonably inferred that defendant was also stealing from Smith *before* her demise. Sometime before Smith's death, defendant told his psychotherapist that their house was apparently burglarized and some of Smith's coins and

jewelry were missing. Defendant and Smith placed the remaining valuables in the car, intending to take them to the bank for safekeeping, but the car was also burglarized and the remaining items lost. Later, however, Smith found in the house property allegedly taken in the burglaries. The clear implication was that defendant took the property himself, intending to sell it, and blamed the loss on a bogus burglary.

This possibility was consistent with other evidence. Shortly before her murder, Linda Smith, defendant, and one Lewis Smith (no apparent relation) had dinner together. Defendant and Lewis Smith took Linda Smith's car to buy some liquor. She called the police and reported her car as stolen when defendant was gone for more than 45 minutes. The prosecutor invited the jury to conclude that she must have known about the prior thefts of her property because she was so quick to conclude defendant had stolen her car.

We admit that these inferences are by no means the only ones that may be drawn from the evidence and that the evidence of premeditation and deliberation is not strong. Nevertheless, the inferences urged by the prosecutor were permissible ones in that they are reasonably deducible from the evidence. (*Johnson, supra*, 26 Cal.3d at p. 576.) Viewing the evidence in a light most favorable to the People and presuming all reasonable facts in support of the judgment, we conclude a "rational trier of fact" could have been persuaded that there was evidence of (1) planning activity, and (2) motive. Although the manner of killing was not indicative of a preconceived design to kill (*Lucero, supra*, 44 Cal.3d at p. 1020 ["multiple blows to the skull from a blunt instrument [is not very] suggestive of premeditated murder"]), appellate courts sustain verdicts of first degree murder where there is evidence of motive in conjunction with planning activity. (*Anderson, supra*, 70 Cal.2d at p. 27.) We thus conclude there was sufficient evidence to support the jury's verdict that defendant premeditated and deliberated the killing.

## 2. *The Psychotherapist-patient Privilege*

Defendant raises a host of issues centered on his assertion that the trial court's decision to permit the prosecutor to examine Drs. Hutcheson and Hamilton, defendant's two psychotherapists, violated Evidence Code section 1014, the psychotherapist-patient privilege. That section provides in pertinent part that subject to waiver by voluntary disclosure, "the patient, whether or not a party, has a privilege to refuse to disclose, and to prevent another from disclosing, a confidential communication between patient and psychotherapist if the privilege is claimed by: [¶] (a) The holder of the privilege." Because the factual background of this issue is somewhat complicated, we discuss it in some detail.

a. *Background*

On January 27, 1986, i.e., more than two weeks before the murder, defendant voluntarily sought mental health counselling. He had four sessions with Dr. Hamilton, a postdoctoral intern; he was also examined by Dr. Hutcheson, a psychiatrist, once briefly and again for one full session.

Based on defendant's history as well as comments he made in these sessions, both Dr. Hutcheson and Dr. Hamilton warned Linda Smith that she was in danger. (See *Tarasoff* v. *Regents of University of California* (1976) 17 Cal.3d 425 [131 Cal.Rptr. 14, 551 P.2d 334, 83 A.L.R.3d 1166], hereafter *Tarasoff*.) Prior to trial, the prosecutor moved for a hearing and a determination that both doctors could testify about some allegedly privileged information, namely the *Tarasoff* warning. Both psychotherapists, represented by county counsel, joined the People's motion. Defendant opposed the motion, relying on the psychotherapist-patient privilege.

After an in camera hearing in which both doctors testified, the trial court ruled that the prosecution could "inquire into the substance of the conversations with Linda Smith," and that conversations between the doctors and the victim were discoverable, as were the professional impressions and diagnosis that prompted the warning. Included in the latter ruling were statements made by defendant, although the trial court specifically excluded "any statements [defendant made in therapy] that did not trigger the *Tarasoff* warning."

Shortly before Dr. Hutcheson testified at trial, the parties met in chambers to discuss the doctor's proposed testimony.[2] The prosecutor proposed to ask Dr. Hutcheson about defendant's comments concerning homicidal thoughts and whether a warning was given. Defendant objected "to any information going before the jury about Dr. Hutcheson having a conversation with Linda and telling her to do something." He initially relied on hearsay and relevance grounds for his objection, later adding Evidence Code section 352 as a third ground for exclusion. ▪▪▪▪ No mention was made of the psychotherapist-patient privilege.[3] After some additional discussion, the trial court overruled defendant's objections.

---

[2] The pretrial motion regarding the applicability of the psychotherapist-patient privilege was decided by Judge McMahon, the original trial judge. Between that ruling and the start of trial, defendant filed an affidavit of prejudice against Judge McMahon and he was replaced by Judge Dodds. (See Code Civ. Proc., § 170.6.) The parties met in chambers to discuss the scope of Dr. Hutcheson's proposed testimony, apparently because Judge Dodds was not "particularly familiar" with Judge McMahon's ruling and wanted to reaffirm the limits on the witness's testimony.

[3] Although defendant did not renew at trial his claim of privilege, we decline to find he waived the issue for purposes of this appeal. Under the circumstances of this case, his pretrial

The prosecutor also expressed his intention to ask Dr. Hutcheson about his conversation with Smith, arguing that defense counsel opened the door to such evidence by informing the jury, in his opening statement, that defendant was provoked by Smith. This statement, the prosecutor claimed, placed defendant's state of mind in issue. The trial court was dubious of this argument, stating that until defendant actually introduced evidence on that topic, his state of mind was not in issue. All parties, however, expressed concern for the witness's inconvenience should he be called to the stand to give his testimony piecemeal. Defense counsel then proposed to make an offer of proof in camera regarding his intended line of questioning on cross-examination. All agreed to this procedure.

After the prosecutor left the judge's chambers, defense counsel stated that, on cross-examination, he intended to ask whether Dr. Hutcheson had reached a diagnosis of defendant, and he expected the doctor to report that he had diagnosed defendant as a paranoid schizophrenic-chronic. Counsel admitted, "That's going to put Mr. Wharton's mental condition into issue." When the prosecutor returned, the judge informed him, "I'm satisfied that the mental state of the defendant will be in issue in this case. I'm so informing you, and you may take whatever actions you so desire."

With the jury present, Dr. Hutcheson testified that on January 27, 1986, he spoke briefly with defendant at Dr. Hamilton's request in what he termed was a "semi-emergency session." After five or ten minutes, Dr. Hutcheson determined that defendant was tense, anxious, and had "a variety of symptoms." He concluded defendant should see him again as soon as possible. Dr. Hutcheson had no notes from this brief session and could not recall whether defendant made any comments that could be construed as threats of violence.

Dr. Hutcheson saw defendant again on February 6th. The psychiatrist discovered defendant was suffering from auditory hallucinations, that they were worse under stress, but that defendant could differentiate the voices from his own thoughts. Defendant told Dr. Hutcheson that he stayed away from guns and knives because he was afraid he might use them on himself or others. Defendant said nothing else about "potential threats or violence or orders to kill."

Defendant did not cross-examine Dr. Hutcheson at that time but reserved the right to do so later in the trial.

motion to exclude the testimony of the two therapists was advanced on a specific legal theory, was directed to a "particular, identifiable body of evidence," and the motion was made "at a time . . . when the trial judge [could] determine the evidentiary question in its appropriate context." (*People* v. *Morris, ante,* 152, at p. 190 [279 Cal.Rptr. 720, 807 P.2d 949].) Indeed, in this case, the therapists testified in camera, providing the trial judge with ample context with which to rule on the motion.

After a similar in-chambers discussion with Dr. Hamilton the next week, she testified and described her therapy sessions with defendant. She first saw defendant on January 27th. Her notes revealed that he had a "fear of hurting [his] current girlfriend" and was afraid he would hit Smith. Although Dr. Hamilton's intake narrative states that defendant often had "thoughts . . . of murder," she could not recall what defendant said to prompt her to write those words. She was sure defendant never used the words "kill" or "murder."

Dr. Hamilton next saw defendant on February 3, 1986. Her notes for that session state defendant "feels he is losing more control of his anger." Defendant's next appointment with Dr. Hamilton was for February 7th. During this session, he made no comments regarding violence towards Linda Smith. At his fourth and final session with Dr. Hamilton on February 14th, Dr. Hamilton's notes report that defendant "feels manipulated by Linda" but she could not recall defendant's precise words. From her notes, she recalled that defendant told her that Linda Smith had reported her car as stolen, an apparent reference to the time defendant and Lewis Smith took Linda Smith's car to buy some liquor. Finally, Dr. Hamilton noted defendant appeared calm, coherent, and was neatly groomed.

On cross-examination, Dr. Hamilton reiterated that defendant never used the word "kill" or "murder." Further, defendant's admitted fear of losing control of his anger was not directed at anyone in particular. When defendant became angry at Smith, he would walk away or hit a wall. On redirect examination, she testified her notes stated that defendant said, "Sometimes [Smith is] frightened of me. I need to get away from her and find solitude." Dr. Hamilton said defendant became aggressive when intoxicated.

After a recess, the prosecutor stated in chambers that he intended to question Dr. Hamilton about statements defendant made regarding the coins and jewelry that were allegedly taken in a burglary, only to be later discovered in the house by Smith. The trial court overruled defense counsel's relevance and Evidence Code section 352 objections and the prosecutor thereafter elicited this information from Dr. Hamilton in open court.

At the close of Dr. Hamilton's testimony, defendant recalled Dr. Hutcheson for cross-examination and established that the witness had diagnosed defendant as a paranoid schizophrenic.

b. *Discussion*

We begin with the fact that both Dr. Hamilton and Dr. Hutcheson were qualifying psychotherapists (Evid. Code, § 1010), and that defendant was

their patient (*id.*, § 1011). Because defendant established a psychotherapist-patient relationship with both doctors, statements he made in the course of those professional relationships were, generally speaking, confidential communications coming within the scope of the privilege. (*Id.*, §§ 1012 [defining the term "confidential communication"], 1014 [outlining the privilege].) ■■■ Defendant's arguments revolve around his claim that the trial court misconstrued the scope of the exception to the psychotherapist-patient privilege embodied in Evidence Code section 1024 (hereafter section 1024). That section provides, "There is no privilege under this article if the psychotherapist has reasonable cause to believe that the patient is in such mental or emotional condition as to be dangerous to himself or to the person or property of another and that disclosure of the communication is necessary to prevent the threatened danger."

It appears, however, that defendant waived the privilege by placing his mental state in issue. The record shows that prior to Dr. Hutcheson's testimony, the parties were concerned about the possibility of Dr. Hutcheson delivering his testimony piecemeal. During this discussion, the prosecutor stated that "The issue generally is . . . quote, 'Once the defense puts the defendant's mental state in issue . . .' unquote, the privilege is waived . . . . I think that's what you're talking about." Defense counsel replied, "Yes." Later, defense counsel made an offer of proof in chambers that he intended to ask Dr. Hutcheson whether he had made a diagnosis of defendant. Counsel admitted, "That's going to put Mr. Wharton's mental condition in issue." The trial court relayed this information to the prosecutor. Later, before the jury, defense counsel queried Dr. Hutcheson about his diagnosis of defendant.

Evidence Code section 1016 states in pertinent part that "There is no privilege . . . as to a communication relevant to an issue concerning the mental or emotional condition of the patient if such issue has been tendered by: [¶] (a) The patient." This section seems applicable to the facts of this case and, indeed, seems to have been anticipated by defense counsel, who stated on the record that he understood he was placing defendant's mental state in issue.

Defendant argues it is unfair to rely on his offer of proof and subsequent cross-examination of Dr. Hutcheson to conclude he waived the privilege. He asserts that a closer reading of the record reveals that his offer of proof "was a product of the trial court's erroneous ruling" permitting the prosecution to inquire about the *Tarasoff* warning (*supra*, 17 Cal.3d 425). In support, he notes that defense counsel stated that "*If* Dr. [Hutcheson] takes the witness stand on cross-examination, one of the things I'm going to ask him is whether he made a diagnosis of Mr. Wharton. I know that he did

and I know what the diagnosis is. He's going to tell the court that he was diagnosed . . . as a paranoid schizophrenic-chronic." (Italics added.) Defendant insists that we should interpret the single italicized word ("If . . .") as meaning "counsel intended to elicit evidence about [defendant's] mental and emotional condition *only if* the psychotherapist was called as a witness by the prosecution, an occurrence which the defense had consistently opposed." (Italics in original.)

Defendant's position thus appears to be that although he placed his mental state in issue, he was unfairly "coerced" into doing so by the trial court's "erroneous ruling" on the scope of the exception to the privilege embodied in section 1024. Defendant and amici curiae[4] raise a plethora of arguments that, they claim, demonstrate that the trial court misinterpreted section 1024. Because the validity of our conclusion that defendant waived the privilege under Evidence Code section 1016 hinges on the correctness of the trial court's ruling on the scope of the privilege, we proceed to discuss these challenges. As explained below, because we find the trial court's ruling on the scope of the section 1024 exception was not "erroneous" but was in fact a correct interpretation of the statute, defendant's "coerced waiver" theory is untenable.

Prior to trial, the court ruled that the prosecution could question Drs. Hutcheson and Hamilton about both (1) the substance of their warning to the victim, and (2) defendant's statements, made in therapy, that "triggered" the warning. The former portion of the court's ruling is unquestionably correct: once confidential "statements have been revealed to third persons in a communication that is not itself privileged . . . they are no longer confidential." (*People v. Clark* (1990) 50 Cal.3d 583, 619-620 [268 Cal.Rptr. 399, 789 P.2d 127].)

Defendant claims that the court interpreted section 1024 too broadly by ruling that the privilege was involuntarily waived for all statements for all purposes merely because some of his statements (made in therapy) justified disclosure in the form of a warning to the victim. Amici curiae echo this argument and maintain that even if section 1024 permitted the prosecution to question defendant's psychotherapists about confidential communications defendant made that caused them to warn the victim, other communications, made in therapy but irrelevant to the warning, were not made available by section 1024. Of particular importance were statements defendant made in therapy concerning the victim's discovery of items purportedly

---

[4] We have received a joint brief from amici curiae California Psychiatric Association, California Association of Marriage and Family Therapists, and California Chapter of National Association of Social Workers et al.

stolen in a previous burglary. The prosecution relied on these statements to bolster its theory that defendant premeditated the homicide.

■ We agree that the mere fact that some statements are nonprivileged by operation of section 1024 does not automatically make all of defendant's confidential communications to his therapists available to the prosecution. "[T]he psychotherapist-patient privilege is to be liberally construed in favor of the patient." (*Roberts* v. *Superior Court* (1973) 9 Cal.3d 330, 337 [107 Cal.Rptr. 309, 508 P.2d 309]; *In re Lifschutz* (1970) 2 Cal.3d 415, 437 [85 Cal.Rptr. 829, 467 P.2d 557, 44 A.L.R.3d 1].) "And, even when the balance tips in favor of disclosure, constitutional concerns require a strict circumscription of the scope of the disclosure." (*Cutter* v. *Brownbridge* (1986) 183 Cal.App.3d 836, 843 [228 Cal.Rptr. 545].) We have an "obligation to construe narrowly any exception to the psychotherapist-patient privilege: we must apply such an exception only when the patient's case falls squarely within its ambit." (*People* v. *Stritzinger* (1983) 34 Cal.3d 505, 513 [194 Cal.Rptr. 431, 668 P.2d 738].)

■ The foregoing authorities, however, provide no support to either defendant or amici curiae because each misconstrue the trial court's ruling. Although the court permitted the prosecutor to inquire about "[s]tatements by the defendant himself which [led] to the impressions and diagnosis and ultimate conclusion to communicat[e] with the victim," the court went on to rule that "[n]ecessarily *excluded* are any statements that *did not* trigger the . . . warning." (Italics added.) Thus, the court expressly limited application of section 1024 to those confidential communications that "triggered" their decision to warn the victim. By circumscribing the scope of the exception to the privilege, the trial court acted in accordance with both the intent of the Legislature and this court's prior pronouncements on the subject. (*Stritzinger, supra,* 34 Cal.3d at p. 513; *In re Lifschutz, supra,* 2 Cal.3d at p. 435.)

■ Defendant also contends section 1024 should not apply after the victim is dead because the purpose of the exception is to avert danger to others, a goal rendered irrelevant after the harm has occurred. Although section 1024 permits a psychotherapist to warn a potential victim of danger, and indeed the therapist has a common law *duty* to do so (*Tarasoff, supra,* 17 Cal.3d 425), defendant argues that section 1024 is a very limited exception to the otherwise strong public policy favoring confidentiality in psychotherapist-patient relationships. Once the threat of harm ceases to exist, he claims, the reason for the exception also evaporates and the interest favoring confidentiality again becomes paramount. Were we to adopt defendant's interpretation of the statute, however, a dangerous patient could regain the protection of the privilege by simply killing his victim, certainly an absurd

result. (*People* v. *Morris* (1988) 46 Cal.3d 1, 15 [249 Cal.Rptr. 119, 756 P.2d 843] ["a statute should not be interpreted in a manner that would lead to absurd results"].)[5] Moreover, such a rule would ill serve the "public interest in safety from violent assault" (*Tarasoff, supra*, 17 Cal.3d at p. 440), an interest our Legislature has found predominant when balanced against the admitted importance of maintaining the confidential nature of statements made in psychotherapy. (*Ibid.*)

We have previously recognized "the public interest in supporting effective treatment of mental illness and . . . the consequent public importance of safeguarding the confidential character of psychotherapeutic communication." (*Tarasoff, supra*, 17 Cal.3d at p. 440; *In re Lifschutz, supra*, 2 Cal.3d at pp. 422-423.) "Psychoanalysis and psychotherapy are dependent upon the fullest revelation of the most intimate and embarrassing details of the patient's life . . . . Unless a patient . . . is assured that such information can and will be held in utmost confidence, he will be reluctant to make the full disclosure upon which diagnosis and treatment . . . depends." (Sen. Judiciary Com. com., 29B West's Ann. Evid. Code (1966 ed.) § 1014, p. 621.)

In light of this strong public policy favoring confidentiality in the psychotherapeutic relationship, defendant claims section 1024 permits a disclosure of statements made in therapy only to warn a *potential* victim, i.e., that the section is prospective only. To support this interpretation, defendant notes that *Tarasoff* discusses section 1024 in terms of averting or preventing threatened danger. (See *Tarasoff, supra*, 17 Cal.3d at p. 441.) In addition, the language of section 1024 itself permits "disclosure of the communication [if it] is necessary to prevent the *threatened* danger." (Italics added.)

Such phraseology in *Tarasoff* is explainable by the fact that that case involved a therapist's common law duty to warn the intended victim of future danger; thus, its perspective was *prospective* in the sense that it

---

[5] Amici curiae find it significant that section 1024 is written in the present tense. Thus, it states that "the psychotherapist *has* reasonable cause to believe that the patient *is* . . . dangerous . . . and that disclosure of the communication *is* necessary." (Italics added.) From this, amici curiae argue that section 1024 permits revelation of confidential communications only if the patient is dangerous "at the time of the proceeding at which disclosure is to occur." Such a literal interpretation would inevitably lead to absurd results. For example, under amici curiae's interpretation, a therapist could never testify that his or her patient was *presently* dangerous to another person in the following circumstances: (1) where the patient was in custody at the time of trial, (2) where the potential victim had moved and the patient did not know where the victim currently lived, (3) where the potential victim lived in another state or country, or (4) as here, where the victim had been killed by the time of trial.

The significance of the particular wording of section 1024 is simply this: that at the time of the warning, the therapist must presently believe his or her patient is dangerous. From that point forward, section 1024 provides, "There is no privilege . . . ."

required disclosure of confidential information *before* the harm occurred. *Tarasoff* did not concern a situation where the harm had already occurred and thus had no occasion to consider the issue. Cases addressing a retroactive application of the statute, i.e., after the threatened harm has occurred, have uniformly held section 1024 applicable.

*People* v. *Gomez* (1982) 134 Cal.App.3d 874 [185 Cal.Rptr. 155], is illustrative. In that case, the defendant killed Herrera, his ex-wife's lover, and then sought to invoke the psychotherapist-patient privilege at trial to prevent two student interns from revealing death threats he made against Herrera. Both interns had revealed the threats to appropriate authorities. On appeal, the defendant claimed that although section 1024 provided there was "no privilege" for such death threats, "the communications became privileged because by the time of trial, the victim was dead and 'disclosure' was no longer 'necessary to prevent . . . danger.'" (134 Cal.App.3d at p. 881.) The Court of Appeal rejected that contention, reasoning that if the preliminary facts supporting application of section 1024 existed prior to the injury (or in that case, death), there was simply "no privilege."[6]

*Gomez, supra,* 134 Cal.App. 3d 874, relied on the reasoning in *Mavroudis* v. *Superior Court* (1980) 102 Cal.App.3d 594 [162 Cal.Rptr. 724]. In *Mavroudis,* the plaintiffs' son Robert was treated by defendant hospital for various mental disorders. Plaintiffs filed a lawsuit based on *Tarasoff, supra,* 17 Cal.3d 425, after Robert attacked them with a hammer, inflicting multiple physical injuries. In connection with the lawsuit, plaintiffs sought discovery of defendant's psychiatric records. After the trial court denied plaintiffs' motion to compel production of records, they sought a writ of mandate, claiming inter alia that section 1024 was applicable. The Court of Appeal recognized that "A literal reading of Evidence Code section 1024 would limit its provisions to a prospective application" and that "Both the language of the statute and the Law Revision Commission comment speak in terms of 'threatened danger.'" (*Mavroudis, supra,* 102 Cal.App.3d at p. 603.) The court nevertheless found section 1024 applicable and reversed the denial of the motion to compel discovery: "If the preliminary facts upon which Evidence Code section 1024 rests were present at a time prior to the injury complained of, section 1024 prevents any privilege from attaching and the psychiatric records are subject to discovery in the subsequent proceeding." (102 Cal.App.3d at p. 604.)

Defendant cites *Scull* v. *Superior Court* (1988) 206 Cal.App.3d 784 [254 Cal.Rptr. 24] (hereafter *Scull*), which he argues supports his assertion that

---

[6]Defendant argues the discussion in *Gomez* of this issue was dictum, claiming the opinion earlier concluded the privilege did not apply because the student interns were not qualified therapists under Evidence Code section 1010. A close reading of the opinion, however, reveals that the court relied on both rationales as alternate holdings.

section 1024 cannot apply after the threatened harm has occurred. In *Scull*, a psychiatrist was charged with the sexual molestation of a minor patient. The district attorney sought discovery of the psychiatrist's records involving his former patients in an attempt to discover whether the accused had molested other patients during past treatment sessions. In addition, the prosecutor argued that if the accused was a pedophile, he was likely a repeat offender, and that disclosure of the names of his previous minor patients would could lead to inculpatory evidence and avert harm to other patients. Over the defendant's objections based on the psychotherapist-patient privilege, the trial court granted the district attorney's discovery motion, but placed strict limitations on the manner in which the former patients could be contacted.

The Court of Appeal let issue a writ of mandate and reversed, ruling the trial court erred in granting the discovery motion. The appellate court balanced the competing interests and found "the proffered use of the evidence sought by the prosecution to be insufficient to overcome the patients' right to confidentiality." (*Scull, supra*, 206 Cal.App.3d at p. 792.)

At one point, the appellate court opined that "there is nothing in the record to suggest that petitioner is still seeing any of his former patients. Hence, the injuries which are complained of had already taken place and there was no evidence before the trial court that injury was likely to occur in the future." (*Scull, supra*, 206 Cal.App.3d at p. 793.) Although this passage might suggest a retroactive application of section 1024, two factors convince us otherwise. First, the *Scull* opinion fails to even mention section 1024; instead, it merely considered a general exception to the psychotherapist-patient privilege on due process grounds.

Second, section 1024 does not apply to the factual situation posed in *Scull*, a case involving a potentially dangerous *therapist*. Section 1024 applies only when a therapist has a "*patient* [that] is in such mental or emotional condition as to be dangerous to himself or to the person or property of another." (Italics added.) The *Scull* court impliedly recognized this fact when, in rejecting the suggestion that *Tarasoff, supra*, 17 Cal.3d 425, required disclosure of the patient names, it reasoned, "[*Tarasoff*] involved discovery concerning dangerous *patients*. The policy which requires that a doctor warn of the proclivities of dangerous patients in order to prevent harm to others is not implicated where the persons who are sought to be identified are not sources of danger to the public." (*Scull, supra*, 206 Cal.App.3d at p. 793, original italics.)

We conclude *Scull, supra*, 206 Cal.App.3d 784, does not support defendant's contention that section 1024 is inapplicable after the threatened harm

has occurred, and instead find the reasoning in *Gomez, supra,* 134 Cal.App.3d 874, and *Mavroudis, supra,* 102 Cal.App.3d 594, more persuasive. Because defendant made comments within the psychotherapeutic relationship which led his therapists to reasonably conclude he posed a threat to the victim, such comments were not privileged pursuant to section 1024. Moreover, because the preliminary facts justifying application of section 1024 existed prior to the realization of the threatened danger, not only were the therapists free to communicate such statements to the victim, but defendant's statements were not privileged and the trial court correctly ruled that evidence concerning those statements was admissible at trial.

Defendant maintains this interpretation of section 1024 is contrary to public policy because it will discourage those in need of help from seeking mental health counseling, fearing their personal and intimate revelations in therapy will be revealed to others. Moreover, he claims those who choose to seek help will be in a worse position for having done so. We considered similar concerns in *Tarasoff, supra,* 17 Cal.3d 425, and found "that such predictions are entirely speculative." (*Id.* at p. 440, fn. 12.) Moreover, as Justice Tobriner explained in that case, "the public policy favoring protection of the confidential character of patient-psychotherapist communications must yield to the extent to which disclosure is essential to avert danger to others. The protective privilege ends where the public peril begins." (*Id.* at p. 442.) We thus conclude section 1024 reflects " 'a clear expression of legislative policy concerning the balance between the confidentiality values of the patient and the safety values of his foreseeable victims.' " (17 Cal.3d at p. 441, fn. 13, quoting Fleming & Maximov, *The Patient or His Victim: The Therapist's Dilemma* (1974) 62 Cal.L.Rev. 1025, 1063.) Accordingly, we cannot agree that our interpretation of section 1024 permitting Dr. Hutcheson and Dr. Hamilton to testify at trial contravenes public policy. Instead, such a rule vindicates the Legislature's careful balance between the need for confidentiality in the psychotherapeutic relationship on the one hand, and public safety concerns on the other.

Amici curiae contend the California Law Revision Commission Comment (hereafter the Comment) to section 1024 (Deering's Ann. Evid. Code (1986 ed.) § 1024, p. 213) compels a contrary interpretation of that statute. The Comment states: "This section provides a *narrower* exception to the psychotherapist-patient privilege than the *comparable* exceptions provided by [Evidence Code] Section 982 (privilege for confidential marital communications) and [Evidence Code] Section 1004 (physician-patient privilege). Although this exception might inhibit the relationship between the patient and his psychotherapist to a limited extent, it is essential that appropriate action be taken if the psychotherapist becomes convinced during the course

of treatment that the patient is a menace to himself or others and the patient refuses to permit the psychotherapist to make the disclosure necessary to prevent the threatened danger." (Italics added.)

Amici curiae first argue that, based on the language in the Comment, we should interpret section 1024 so that it is "comparable" to the other exceptions listed. Evidence Code sections 982 and 1004 delineate exceptions to the marital and physician-patient privileges, respectively, "in a proceeding to commit [the patient or either spouse] or otherwise place him or his property, or both, under the control of another because of his alleged mental or physical condition." Both of these exceptions benefit the holder of the privilege. To be "comparable" to these exceptions, amici curiae claim, we should interpret section 1024 in the same manner, i.e., that it should only apply "in proceedings conducted for the benefit of the persons to be protected by the section."

Such a constricted interpretation is inconsistent with the plain meaning of section 1024 as well as the Comment. In speaking in terms of "prevention" of a threatened danger "to himself or the person . . . *of another*" (italics added), section 1024 is clearly intended not only as an exception for the benefit of a troubled patient, but for an endangered third person as well. Moreover, the Comment's recognition that the exception "might inhibit" the psychotherapeutic relationship clearly anticipates that invocation of the exception would not inure to the patient's benefit.

Amici curiae next contend the Comment's statement that section 1024 is "a narrower exception" than Evidence Code sections 982 and 1004 means section 1024 should be interpreted to apply "only in proceedings designed to prevent potential harm to the patient or to the person or property of another." The Legislature, however, has shown that it knows how to limit application of an exception to the psychotherapist-patient privilege to a certain type of proceeding. (See Evid. Code, §§ 1023 [no privilege in proceeding to determine criminal defendant's sanity], 1025 [no privilege in proceeding brought by patient to establish his competence].) We thus cannot assume the Legislature intended the same effect when it did not expressly so provide in section 1024. (See *Stickel* v. *Harris* (1987) 196 Cal.App.3d 575, 591 [242 Cal.Rptr. 88]; *Fogarty* v. *Superior Court* (1981) 117 Cal.App.3d 316, 320 [172 Cal.Rptr. 594].)[7]

---

[7] We recognize that *Mavroudis* v. *Superior Court, supra,* 102 Cal.App.3d 594, relied on by amici curiae, states that section 1024 was "apparently . . . designed to enable the therapist to initiate commitment proceedings and to testify in those proceedings when he determines the patient may present a danger to himself or others." (102 Cal.App.3d at p. 603; see also *People* v. *Memro* (1985) 38 Cal.3d 658, 706 [214 Cal.Rptr. 832, 700 P.2d 446] [dis. opn. by Grodin, J.].) We do not read this dictum in such a limited fashion. Instead, we conclude that

The psychotherapist-patient privilege in Evidence Code section 1014, as well as the dangerous-patient exception in section 1024, are both part of division 8 of the Evidence Code. Evidence Code section 910 states that "the provisions of this division apply in all proceedings." The term "proceedings" is defined in pertinent part as "any action, hearing, [or] investigation . . . in which, pursuant to law, testimony can be compelled to be given." (Evid. Code, § 901.) In light of these provisions, amici curiae argue that because the *Tarasoff* warning (*supra*, 17 Cal.3d 425) was not given in a "proceeding" as defined in Evidence Code section 901, section 1024 cannot apply. Defendant's *trial*, however, is a proceeding as defined by Evidence Code section 901, so section 1024 clearly applied there.

Amici curiae also argue that the out-of-court disclosure of confidential information to the victim did not "waive" the privilege for purposes of defendant's trial. As we explained, however, in *People* v. *Clark, supra*, 50 Cal.3d at page 620, "The question is not whether the psychotherapist-patient privilege has been waived . . . but whether the privilege may be claimed at all once the communication is no longer confidential." Because confidential communications were disclosed to a third party, here victim Smith, such statements lost their confidential status and were no longer privileged. (*Ibid.*)

■ Both defendant and amici curiae argue that application of section 1024 does not operate to remove the psychotherapist-patient privilege for communications not disclosed. In making this argument, defendant misperceives the nature of section 1024. Under that section, if a certain factual predicate exists (i.e., if the therapist believes the patient is a danger to another and disclosure is necessary to prevent the danger), the statute does not provide that the privilege is "waived"; it merely provides that "[t]here is no privilege."

Thus, operation of section 1024 is not keyed to voluntary disclosure and the concept of waiver as is Evidence Code section 912, which provides for waiver upon an uncoerced disclosure by the holder of the privilege. The fact that the two therapists warned the victim is not the reason why some of defendant's confidential communications were admissible at trial; rather, it

although section 1024 *permits* a therapist to testify in commitment proceedings (provided the statutory prerequisites are satisfied), application of section 1024 is not *limited* to such proceedings.

This result follows from the fact that some evidentiary privileges are expressly excepted from applying in criminal proceedings. (See Evid. Code, §§ 998 [physician-patient privilege does not apply in criminal proceedings], 985 [marital-communications privilege does not apply in certain criminal proceedings].) Because the psychotherapist-patient privilege is not so limited, we can deduce that the Legislature intended that privilege to apply in criminal proceedings. We thus conclude that section 1024 is not limited to commitment proceedings.

was the existence of the specified factual predicate that brings this case within the ambit of section 1024.

Recognizing the paramount importance of confidentiality in the psychotherapeutic relationship, we stated in *Tarasoff, supra,* 17 Cal.3d 425, that "the therapist's obligations to his patient require that he not disclose a confidence unless such disclosure is necessary to avert danger to others, and even then that he do so discreetly, and in a fashion that would preserve the privacy of his patient to the fullest extent compatible with the prevention of the threatened danger." (*Id.* at p. 441.) Amici curiae argue that our interpretation of section 1024 effectively nullifies this admonition because being compelled to testify against one's patient is the antithesis of a "discreet" disclosure. The quoted language from *Tarasoff,* however, read in context, clearly spoke to the proper balance between the therapist's common law duty to the endangered person and the patient's privacy, not to the application of section 1024. Moreover, the interpretation of section 1024 we adopt today preserves a patient's privacy to that extent which is consistent with the purpose of that provision inasmuch as it prohibits revelation of confidential communications, revealed in therapy, which did not trigger the warning to the victim.

Moreover, amici curiae exaggerate the effect of a *Tarasoff* warning (*supra,* 17 Cal.3d 425). Not every warning is inevitably followed by realization of the threat. Thus, we cannot agree that "the very act of warning the victim would mean the therapist could be compelled to reveal his patient's communications in any and all public proceedings thereafter." We assume that in many if not most cases, a discreet warning will help avoid any potential danger to the victim and thus obviate the necessity of having a subsequent public proceeding at which the therapist could be compelled to testify. In addition, we reemphasize that not every statement a patient makes in therapy can be revealed simply because a warning was given. As explained, *ante,* only those communications that triggered or caused the warning fall with the scope of section 1024.

As an alternative to our interpretation of section 1024, both defendant and amici curiae propose we interpret that section to permit therapists to warn potential victims in order to avert potential danger, "but to forbid any other use of such disclosures." We disagree that this restrictive view of section 1024 is consistent with the Legislature's intent. Although we recognize "our obligation to construe narrowly any exception to the psychotherapist-patient privilege" (*Stritzinger, supra,* 34 Cal.3d at p. 513), that obligation applies to determining whether the factual predicate of section 1024 has been met. Once a court determines a case falls within the ambit of that section, the statute simply provides that "[t]here is no privilege." Moreover,

once confidential communications are revealed by a therapist to a third party, such communications lose their confidential status. (*Clark*, *supra*, 50 Cal.3d at pp. 619-620.) We thus conclude the plain meaning of the language of section 1024 cannot be reasonably read as having the far-reaching, preclusive effect advocated by defendant and amici curiae.

Defendant further argues section 1024 is inapplicable because his psychotherapists did not reveal any confidential communications to the victim. Even assuming arguendo such a revelation is a prerequisite to application of section 1024 at a postdisclosure trial, we reject the argument for two reasons. First, defendant failed to object to the introduction of testimony of his therapists on this ground. (*People* v. *Allen* (1986) 42 Cal.3d 1222, 1271; Evid. Code, § 353 [232 Cal.Rptr. 849, 729 P.2d 115].)

Second, even assuming we were to overlook the absence of a specific objection on this ground (see *People* v. *Coleman* (1988) 46 Cal.3d 749, 777 [251 Cal.Rptr. 83, 759 P.2d 1260]), it appears that "confidential communications," as defined in the Evidence Code, were disclosed to the victim. The record reveals that during an in chambers meeting, Dr. Hamilton recounted the *Tarasoff* (*supra*, 17 Cal.3d 425) warning she gave to victim Linda Smith: "I said to her, 'You're in a very dangerous situation. I think you should get out,' essentially. And she said, 'Well, he's tied me up and held a butcher knife to my stomach, and he's hit me,' and she said, 'If I leave him I'll be lonely,' or, 'he would kill me.' [¶] And that was—so that's—at which point I told her I thought she should get police protection. At which point she said to me, 'Well, I've tried that.' She didn't seem to think that would work."[8]

Evidence Code section 1012 states in pertinent part that the term " 'confidential communication between patient and psychotherapist' means information, including information obtained by an examination of the patient, transmitted between a patient and his psychotherapist in the course of that relationship and in confidence . . . , and includes a diagnosis made and the advice given by the psychotherapist in the course of that relationshp." As is clear, although Dr. Hamilton did not reiterate for the victim the exact statements defendant made in therapy which led her to warn the victim, Dr. Hamilton revealed "information . . . transmitted between a patient and his psychotherapist" within the professional relationship. We

---

[8] The People claim defendant fails to carry his burden of providing an adequate record on appeal supporting his contention. Specifically, they contend the portions of the trial transcript setting forth the therapists' *Tarasoff* warning have been sealed, precluding the People's examination of them. As the quoted passage demonstrates, however, part of the *unsealed* trial transcript reveals that confidential communications were disclosed.

conclude defendant's psychotherapists revealed confidential communications, as that term is defined in the Evidence Code, to the victim.

Defendant finally argues that a broad interpretation of section 1024 implicates constitutional privacy and due process concerns. Other than a bare mention, however, defendant does not expand on his due process claim. We thus decline to consider it further. (See *People* v. *Blankenship* (1989) 213 Cal.App.3d 992, 995-996 [262 Cal.Rptr. 141].)

■ In regard to his privacy claim, we recognize the relationship between the psychotherapist-patient privilege and a patient's constitutional right to privacy. (Cal. Const., art. I, § 1; *In re Lifschutz, supra,* 2 Cal.3d at pp. 431-432, citing *Griswold* v. *Connecticut* (1965) 381 U.S. 479, 484 [14 L.Ed.2d 510, 514, 85 S.Ct. 1678].) "It is also well established, however, that the right to privacy is not absolute, but may yield in the furtherance of compelling state interests." (*Stritzinger, supra,* 34 Cal.3d at p. 511.) In this case, the trial court carefully balanced the defendant's rights with the state's interest in seeking to "redress . . . wrongs committed against its citizens." (*Scull, supra,* 206 Cal.App.3d at p. 790.) We find nothing in our interpretation of section 1024 that is in derogation of defendant's constitutional right to privacy.

■ In sum, we conclude that where a psychotherapist warns a potential victim pursuant to section 1024, that statute permits the psychotherapist to reveal, in a later trial or proceeding, both the substance of the warning and the patient's statements, made in therapy, which caused or triggered the warning. Because the trial court's ruling on defendant's motion to exclude such statements based on the psychotherapist-patient privilege was thus correct, defendant's decision to place his mental state in issue and waive the privilege was simply a tactical choice made in response to a correct evidentiary ruling by the trial court. We thus reject his claim that his waiver was coerced.

### 3. *Motion for Mistrial*

Prior to calling Americo Perez to the stand, the parties met in chambers to discuss the scope of Perez's grant of immunity and to warn him not to mention defendant's prior felony conviction. After noting Perez had sustained a recent beating and had some facial injuries, the trial judge instructed the prosecutor "to make sure that it's clear that somehow no implication that Mr. Wharton is in any way, shape or form involved in any retaliation or any suggested retaliation against Mr. Perez."

During the prosecutor's examination of Perez in open court, the following colloquy occurred:

"Q [By the prosecutor] While you were in custody on this case, were you beaten up in the jail?

"A Yes, I was.

"Q On one occasion or more than one occasion?

"A About two occasions.

"Q Is something wrong with your mouth right now?

"A I got a wired jaw.

"Q Whoever did this, it was not Mr. Wharton; is that correct?

"A No. That's correct, it wasn't Mr. Wharton.

"Q Would you tell us in your opinion if I use the phrase snitch or snitch jacket, do you know what I'm talking about?

"A Yes, I do.

"Q Would you explain that to the jury?

"A That's somebody that gets in a situation to where they—well, in my situation I wasn't the snitch. Actually, Mr. Wharton there actually got the word out saying that."

Defense counsel immediately sought a sidebar conference and the jury was excused. The court agreed that the witness's statement was blurted out and not in response to the prosecutor's question. Defense counsel moved for a mistrial and sought a consultation with defendant. Because the jury was waiting, all agreed that the prosecutor should proceed with an unrelated witness. After her testimony, the court received a note from one of the jurors, asking: "What was allowed and what was not allowed with regard to Americo Perez' testimony?" No further action was taken that day.

The matter was taken up in chambers the next day. Defense counsel renewed his motion for a mistrial. After hearing argument, the trial judge stated that "the jury would take any admonition not to pay attention to certain testimony fairly seriously and would listen to it and be influenced by it." The court ultimately denied the motion, stating: "I'm not suggesting it isn't serious. I don't think it's near as serious as [defense counsel is] contending." The jury was recalled and the court announced: "We received a

note from one of the jurors yesterday concerning an evidentiary question. I think it will be answered eventually."

The court next addressed the matter after a weekend break. With the consent of defense counsel, the court gave the following admonishment: "Ladies and gentlemen, last week during the testimony of Mr. Americo Perez, Mr. Perez blurted out a statement about the defendant, Mr. Wharton. If you heard the statement, you're instructed to disregard it. Mr. Wharton had nothing to do with any injuries that were sustained by Mr. Americo Perez. You shall take it as a fact that Mr. Wharton had nothing to do with the injuries of Mr. Perez. [¶] You shall not draw any adverse inferences against Mr. Wharton from the fact that any witness was injured while in or out of the jail." The direct examination of Perez then continued.

Significantly, Perez admitted on cross-examination that his injuries were caused by a former neighbor named Herbert Lewis. The dispute apparently centered around Perez's occupancy of a residence that should have remained vacant because of Perez's failure to pay rent. Lewis called the police and Perez conceded he told Lewis "a couple things that he disliked." Perez testified that when they encountered each other later that night, Lewis punched him twice before fleeing.

■ Defendant insists the court abused its discretion by denying his motion for a mistrial. He emphasizes that Perez's blurted-out assertion that defendant "got the word out" (presumably that Perez had testified against him at the preliminary examination and was thus a "snitch") was irrelevant and extremely prejudicial inasmuch as defendant was being tried for a very violent crime. In addition, he claims the information was extremely damaging in the penalty phase of the trial because it communicated to the jury that defendant would be a dangerous prisoner if imprisoned for life without the possibility of parole.

■ "A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions." (*People* v. *Haskett* (1982) 30 Cal.3d 841, 854 [180 Cal.Rptr. 640, 640 P.2d 776].) Although most cases involve prosecutorial or juror misconduct as the basis for the motion, a witness's volunteered statement can also provide the basis for a finding of incurable prejudice. (See *People* v. *Rhinehart* (1973) 9 Cal.3d 139, 152 [107 Cal.Rptr. 34, 507 P.2d 642] [witness's inadvertent answer, if error, was not sufficiently prejudicial to justify mistrial].)

 Applying these principles, we conclude defendant's claim of incurable prejudice lacks merit. First, Perez's testimony did not directly implicate defendant in the beating; he merely said defendant "got the word out," thereby requiring the jury to draw the further inference that "the word" led to the injuries. Second, the trial court gave a direct and pointed admonition regarding the volunteered testimony. Although defendant argues the admonishment was disregarded by the jury because the inadvertent statement was made on a Thursday and the admonition did not come until the following Monday, this is mere speculation. Finally, and most importantly, Perez's own later testimony on cross-examination dispelled any lingering doubt about defendant's alleged participation in the beating by placing the blame squarely on his neighbor, for reasons wholly unrelated to Perez's prior testimony. We conclude the court properly denied defendant's motion for a mistrial.[9]

### 4. *Alleged Prosecutorial Misconduct*

 Defendant contends the prosecutor committed prejudicial misconduct during closing argument by making five references to matters outside the record. (*People* v. *Miranda* (1987) 44 Cal.3d 57, 108 [241 Cal.Rptr. 594, 744 P.2d 1127]; *People* v. *Bolton* (1979) 23 Cal.3d 208, 212-213 [152 Cal.Rptr. 141, 589 P.2d 396].) Defendant is precluded from raising this issue on appeal, however, because he failed to timely object and request the jury be admonished. (*Miranda, supra,* at p. 108; *People* v. *Murtishaw* (1981) 29 Cal.3d 733, 759, fn. 21 [175 Cal.Rptr. 738, 631 P.2d 446]; *People* v. *Green* (1980) 27 Cal.3d 1, 34 [164 Cal.Rptr. 1, 609 P.2d 468].) Because none of the comments was so serious that a timely admonition would have been inadequate to cure the harm, any objection to the prosecutor's argument is deemed waived. (*People* v. *Harris* (1989) 47 Cal.3d 1047, 1084 [255 Cal.Rptr. 352, 767 P.2d 619]; *Green, supra,* at pp. 34-35.)

Defendant concedes trial counsel failed to object but presents two reasons why that fact is not controlling. First, he claims a timely objection and admonition would not have cured the harm because juries generally have a high regard for the comments of the prosecutor, who is the People's

---

[9] We further reject defendant's claim that denial of the motion for a mistrial violated his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the federal Constitution. His sole support for this challenge is *Dudley* v. *Duckworth* (7th Cir. 1988) 854 F.2d 967, certiorari denied *sub nomine Duckworth* v. *Dudley* (1989) 490 U.S. 1011 [104 L.Ed.2d 169, 109 S.Ct. 1655], in which the Seventh Circuit Court of Appeals reversed a state conviction after a trial court erroneously admitted evidence that an immunized witness had received anonymous threatening telephone calls concerning his proposed testimony. The inference in *Dudley* was that one of the defendants made or instigated the calls. Assuming *Dudley* is relevant, it is distinguishable from the present case due to the absence there of a curative admonition or an admission from the victim himself establishing that the defendant was not his assailant.

representative in the trial. (See *Bolton, supra,* 23 Cal.3d at p. 213 [a jury has a "special regard . . . for the prosecutor"].) That argument proves too much, however, because under that theory, no misconduct by the prosecutor in closing argument could ever be deemed cured by a trial court's admonition. We thus reject that point as contrary to prior decisions of this court finding waiver under similar circumstances. (E.g., *Harris, supra,* 47 Cal.3d at p. 1084; *Miranda, supra,* 44 Cal.3d at p. 108.)

 Second, defendant would overcome application of the waiver rule by claiming his trial attorney provided ineffective assistance of counsel by failing to object. (*People* v. *Fosselman* (1983) 33 Cal.3d 572, 584 [189 Cal.Rptr. 855, 659 P.2d 1144]; *People* v. *Pope* (1979) 23 Cal.3d 412, 425 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].) Keeping in mind that "a mere failure to object to evidence or argument seldom establishes counsel's incompetence" (*People* v. *Ghent* (1987) 43 Cal.3d 739, 772 [239 Cal.Rptr. 82, 739 P.2d 1250]), we examine each instance of alleged misconduct.

During closing argument, the prosecutor addressed defendant's claim that he killed while in a heat of passion. The prosecutor said: "if it were really heat of passion, what do you think would have happened? Ninety-nine times out of a hundred what happens if you have a heat of passion thing? The person calls the police." Defendant claims the prosecutor was alluding to statistical information not admitted at trial. The jury probably recognized the prosecutor's comment as hyperbole in the context of an argument, not verifiable statistical information. Even if a reasonable juror might have taken this argument to mean the prosecutor was referring to evidence—not admitted at trial—of law enforcement experience in previous heat of passion cases, there is nothing on the record which indicates that counsel provided ineffective assistance by failing to object. For example, counsel might not have wanted to highlight the point with the jury and make it wonder if there really was such evidence. Thus, on this record, we cannot conclude counsel was remiss in failing to object.

 The remaining incidents of which defendant complains do not even amount to misconduct. "It is settled that a prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom. [Citations.] It is also clear that counsel during summation may state matters not in evidence, but which are common knowledge or are illustrations drawn from common experience, history or literature." (*People* v. *Sassounian* (1986) 182 Cal.App.3d 361, 396 [226 Cal.Rptr. 880].) "A prosecutor may 'vigorously argue his case and is not limited to "Chesterfieldian politeness"' [citation], and he may 'use appropriate epithets warranted by the evidence.'" (*Fosselman, supra,* 33 Cal.3d at

p. 580; see also *People* v. *Fields* (1983) 35 Cal.3d 329, 362-363 [197 Cal.Rptr. 803, 673 P.2d 680].)

▇▇▇▇ Defendant complains the prosecutor discussed defendant's treatment of the victim's body by saying that "We have laws . . . about what you can do with a dead body. Alot [*sic*] of people regard it as a sacred thing. There's someone he says he loves and he stuffs her into a barrel. And that probably occurred before here. Here or before." Although defendant claims that by this comment, the prosecutor implied defendant had committed this same crime in the past, the comment cannot be reasonably interpreted as a reference to a prior murder. Instead, the prosecutor was apparently making reference to a calendar being used as a visual aid for the jury. In any event, there was no evidence that defendant had previously mistreated a dead body in such a manner. Counsel cannot be faulted for failing to object this statement.

A few minutes later, the prosecutor commented on defendant's behavior during his taped interrogation by Officer Tonello, noting it was surprising that defendant did not appear nervous. The prosecutor said, "I mean, I've been dragged into the station on occasion in my younger days. It's kind of a tense situation; right?" Although this remark was not based on any evidence or common knowledge, it was fleeting and tangential and could not possibly have prejudicial even if we assume counsel should have objected.

Later, the prosecutor recalled that when asked whether the victim "was . . . in good health," defendant merely said, "To the best of my knowledge." The prosecutor observed that defendant's answer was reminiscent of "the Watergate cases." Although there was no evidence admitted at trial about "the Watergate cases," the prosecutor's reference was fleeting and clearly permissible as an illustration drawn from history. (*Sassounian, supra*, 182 Cal.App.3d at p. 396.) Counsel thus cannot be criticized for declining to object.

Returning to the heat-of-passion issue, the prosecutor noted that, because defendant was the aggressor in the relationship, this was unlike a case in which a victim of spousal abuse suddenly kills her spouse. "The wife that's had enough after being thumped . . . and finally does something, okay? Like, if you lived in Santa Barbara, like the Veronica Grove shooting. A victim of spousal abuse and finally she shot him." There was no evidence at trial detailing the Veronica Grove shooting.

The prosecutor's mention of the Veronica Grove shooting drew on information neither introduced as evidence at trial nor arguably of common knowledge. The remark, however, was fleeting and tangential and could not

possibly have prejudiced defendant even if misconduct. Thus, assuming arguendo counsel should have objected, relief is not warranted. In sum, counsel's failure to object did not constitute ineffective assistance, and his failure to object to the alleged prosecutorial misconduct waived the issue for appeal.

Finally, although we recognize that prosecutorial misconduct may in some cases be "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process" (*Harris, supra,* 47 Cal.3d at p. 1084, citing *Donnelly* v. *DeChristoforo* (1974) 416 U.S. 637, 642-643 [40 L.Ed.2d 431, 436-437, 94 S.Ct. 1868]), such is not the case here. The prosecutor's comments were brief, mild, and noninflammatory.

## 5. *Instruction on Provocation*

Defendant requested the following special jury instruction: "A defendant may act in the heat of passion at the time of the killing as a result of a series of events which occur over a considerable period of time. [¶] When the provocation extends for a long time, you must take such period of time into account in determining whether there was a sufficient cooling period for the passion to subside. The burden is on the prosecution to establish beyond a reasonable doubt that the defendant did not act in the heat of passion." The trial court rejected the proposed instruction on the dual grounds that it was an incorrect statement of the law and that the correct legal points raised were adequately covered in other instructions.

 Defendant challenges both reasons for the trial court's refusal to give his requested instruction. We agree with defendant's initial point that provocation sufficient to reduce murder to manslaughter need not occur instantaneously, but may occur over a period of time. *People* v. *Berry* (1976) 18 Cal.3d 509 [134 Cal.Rptr. 415, 556 P.2d 777], is illustrative. In *Berry,* the defendant's wife Rachel traveled alone to Israel three days after their wedding. When she returned, she announced that she loved another man, they had been sexually intimate, and she now wanted a divorce. For a period of 13 days, "Rachel continually provoked defendant with sexual taunts and incitements, alternating acceptance and rejection of him." (*Id.* at p. 514.) The defendant killed Rachel.

Citing *People* v. *Borchers* (1958) 50 Cal.2d 321 [325 P.2d 97], we concluded that the "two-week period of provocatory conduct" by the defendant's wife was sufficient to justify an instruction on voluntary manslaughter based on heat of passion. (*Berry, supra,* 18 Cal.3d at p. 515; see also *Borchers, supra,* at p. 329 [the victim's "long continued provocatory conduct"]; *People* v. *Bridgehouse* (1956) 47 Cal.2d 406 [303 P.2d 1018] [same].) The key

element is not the duration of the source of provocation but " 'whether or not defendant's reason was, at the time of his act, so disturbed or obscured by some passion . . . to such an extent as would render ordinary men of average disposition liable to act rashly or without due deliberation and reflection, and from this passion rather than from judgment.' " (*People* v. *Rich* (1988) 45 Cal.3d 1036, 1112 [248 Cal.Rptr. 510, 755 P.2d 960], quoting *People* v. *Logan* (1917) 175 Cal. 45, 49 [164 P. 1121], italics omitted.) Indeed, we note that a jury instruction indistinguishable from defendant's proposed instruction was approved, albeit in dictum, by the Fourth District Court of Appeal. (*People* v. *Thompkins* (1987) 195 Cal.App.3d 244, 256-257 & fn. 7 [240 Cal.Rptr. 516].)

Defendant's second point—that his proposed instruction was not duplicative of other instructions—also has merit as to some portions of the instruction. The jury was given comprehensive instructions on heat of passion and provocation, including one stating that "the killing must have occurred while the slayer was acting under the direct and immediate influence of . . . heat of passion," and that "the question as to whether the cooling period has elapsed and reason has returned is not measured by the standard of the accused, but the duration of the cooling period is the time it would take an average or ordinarily reasonable person to have cooled his heat of passion and for his reason to have returned." In addition, the jury was told that the prosecution bore the burden of proving defendant did not act while under the heat of passion.

Despite these instructions, defendant's proposed instruction raised two points not covered by the standard CALJIC instructions delivered by the court. First, the jury was not informed that provocation could occur over a "considerable period of time." Second, it was not told that if provocation occurred over such a period, the jury "must" take that period of time into account in determining the effect of the cooling-off period. As we discuss, however, the trial court's refusal to deliver an instruction addressing these legal points does not require reversal.

██ A criminal defendant is entitled, on request, to a instruction "pinpointing" the theory of his defense. (*People* v. *Wright* (1988) 45 Cal.3d 1126, 1137 [248 Cal.Rptr. 600, 755 P.2d 1049]; *People* v. *Sears* (1970) 2 Cal.3d 180, 190 [84 Cal.Rptr. 711, 465 P.2d 847].) As we recently explained, however, instructions that attempt to relate particular facts to a legal issue are generally objectionable as argumentative (*Wright, supra,* at p. 1137), and the effect of certain facts on identified theories "is best left to argument by counsel, cross-examination of the witnesses, and expert testimony where appropriate." (*Id.* at p. 1143.)

■ Whether the period of provocation was long or short, the jury should consider all the facts to determine whether "sufficient time ha[d] elapsed between the provocation and the fatal blow for passion to subside and reason to return." (*People* v. *Wickersham* (1982) 32 Cal.3d 307, 327 [185 Cal.Rptr. 436, 650 P.2d 311].) By directing that the jury "must" take into account the long period of provocation in determining the effect of a cooling-off period, defendant's proposed instruction improperly singled out one factor, favorable to defendant, and improperly elevated it over other factors that the jury should also consider. This portion of the instruction was thus objectionable as argumentative and properly refused, albeit for the wrong reason, by the trial court. (*Wright, supra,* 45 Cal.3d at p. 1138, and cases cited.)

By contrast, the court erred in refusing to instruct the jury, at defendant's request, that legally adequate provocation could occur over a considerable period of time. It was defendant's theory at trial that no single action on the part of the victim provoked the fatal blow but that the book-throwing incident was merely the culmination of his pent-up frustration and anger emanating from his ongoing dysfunctional relationship with the victim. In other words, his defense theory at trial was that he killed after enduring provocatory conduct by the victim over a period of weeks.

The People argue there was insufficient evidence of this theory to justify the instruction. We disagree; defendant proffered evidence from which reasonable persons could have concluded there was sufficient provocation to reduce murder to manslaughter. (See *Wickersham, supra,* 32 Cal.3d at p. 324.) Because defendant requested a "pinpoint" instruction on his theory of the case that was neither argumentative nor duplicated in the standard instructions, the trial court erred in failing to deliver it to the jury. (*Wright, supra,* 45 Cal.3d at p. 1144.)

Although the court erred by refusing defendant's requested instruction (or a portion thereof), the error does not require reversal. ■ Reversal is required only if "the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to [defendant] would have been reached in the absence of the error." (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]; see also *Wright, supra,* 45 Cal.3d at pp. 1144-1154 [applying *Watson* to find the instructional error harmless].)[10]

---

[10]Defendant would have us apply a different standard of prejudice, claiming the court's refusal to deliver his requested instruction violated several of his rights guaranteed by the federal Constitution. We reject this notion. Because no instruction precluded the jury from finding adequate provocation could occur over a period of time, and because the jury was instructed

▮ Significantly, the jury was otherwise given comprehensive instructions on provocation and heat of passion and nothing in those instructions *precluded* the jury from finding adequate provocation resulting from conduct occurring over a considerable period of time. Moreover, defense counsel urged the jury in his closing argument to find such provocation, noting the nature of the relationship (defendant and Smith were "lonely," "dependent," "alcoholic," "pathetic"), the duration of the alleged provocation ("we know that there may have been days and weeks of argument and drinking and confusion"), and that Smith became depressed and "verbally argumentative" when drunk. Later, counsel recounted defendant's statements to Officer Tonello, noting that "The argument . . . started over something small and kept going on and on becoming shriller and shriller and the voice sounding like an alarm." Indeed, one of the main focal points of the trial—for both sides—was defendant's statements to Dr. Hamilton and Dr. Hutcheson beginning *weeks before the killing*, indicating tension between defendant and Smith was building and that defendant felt he was losing control of his anger toward Smith. Thus, there was evidence before the jury showing provocation occurring over a period of time and no instruction precluding the jury from giving that evidence its due weight.

Finally, although the jury was not directly instructed that provocation could occur over a "considerable period of time," the jury was instructed that a killing is first degree murder if it is "the result of deliberation and premeditation, so that it must have been formed upon pre-existing reflection and not upon sudden heat of passion." (See CALJIC No. 8.20.) By finding defendant was guilty of first degree murder, the jury necessarily found defendant premeditated and deliberated the killing. This state of mind, involving planning and deliberate action, is manifestly inconsistent with having acted under the heat of passion—even if that state of mind was achieved after a considerable period of provocatory conduct—and clearly demonstrates that defendant was not prejudiced by the failure to give his requested instruction.

### 6. *Sequence of Deliberations*

▮ Defendant next contends his constitutional rights to due process and to a fair jury trial were compromised by an instruction constraining the

---

that the People have the burden to prove defendant did not act under a heat of passion, no Fifth Amendment violation occurred. Similarly, no Fourteenth Amendment due process violation occurred because the jury was properly instructed on all appropriate lesser included offenses. That the trial court committed harmless error in instructing the jury does not implicate Eighth Amendment concerns, despite the fact that defendant faced the death penalty. Finally, we fail to perceive a Sixth Amendment violation and defendant's one-sentence argument referring to a lack of a unanimity instruction is inapposite in this context. Finding no federal error, we have no occasion to decide whether a standard other than that articulated in *Watson, supra,* 46 Cal.3d 818, should apply.

jury's freedom to deliberate in the order it thought most prudent. He is mistaken. The jury was instructed largely in the language of CALJIC No. 8.75, which states that the jury should first *"determine* whether defendant is guilty or not guilty of . . . first degree murder. . . . [¶] If you unanimously agree that defendant is not guilty of murder in the first degree, . . . you will *determine* whether defendant is guilty or not guilty of murder in the second degree." (Italics added.) A similar instruction directed the jury to continue to determine defendant's guilt of manslaughter should it find defendant not guilty of second degree murder.

Significantly, the trial court informed the jury just prior to delivering CALJIC No. 8.75 that "You may *deliberate* on the charged and lesser included offenses *in any order you wish,* however, you must make your determinations in the order that I now discuss." (Italics added.) By delivering this instruction, the trial court anticipated this court's decisions in *People* v. *Kurtzman* (1988) 46 Cal.3d 322 [250 Cal.Rptr. 244, 758 P.2d 572], and *People* v. *Hernandez* (1988) 47 Cal.3d 315 [253 Cal.Rptr. 199, 763 P.2d 1289]. By instructing the jury it could "deliberate" in any order it wished but must "determine" guilt according to a certain order, the trial court correctly guided the jury. (*Kurtzman, supra,* at p. 336; *Hernandez, supra,* at p. 352.)

## 7. *Instruction on Intoxication*

To inform the jury about the effect of intoxication and mental illness on defendant's mental state at the time of the crime, the jury was instructed largely in the language of CALJIC No. 4.21 as follows: "In the crime charged in the Information and the lesser included offenses, a necessary element of the crime is the existence in the mind of the defendant of a specific intent or mental state. [¶] If the evidence shows that the defendant was intoxicated or had a mental disorder at the time of the alleged offense, the jury should consider his state of intoxication or mental disorder in determining if defendant had such specific intent or mental state. [¶] If from all the evidence you have a reasonable doubt whether defendant *was capable of forming* such specific intent or mental state, you must give the defendant the benefit of that doubt and find that he did not have such specific intent or mental state." (Italics added.)

The italicized phrase diverges from the text of the standard instruction, which instead states that "If from all the evidence you have a reasonable doubt whether the defendant *formed* such specific intent or mental state, . . ." (Italics added.) Defendant argues this minor variation in the instruc-

tion injected the now-disapproved defense of diminished capacity into the proceedings (§ 28, subd. (b)), instead of informing the jury that intoxication or mental disorder could be taken into consideration whether defendant *actually* harbored a particular mental state (§ 28, subd. (a)).

Defendant contends this variation prejudiced him by implying he, rather than the People, had the burden of proof of showing he did not actually harbor the requisite mental state. This is not a fair reading of the instruction, however, and no reasonable juror would so interpret the instruction. (*Francis* v. *Franklin* (1985) 471 U.S. 307, 315-316 [85 L.Ed.2d 344, 354, 105 S.Ct. 1965] [court interpreted instructions as would reasonable juror]; *People* v. *Warren* (1988) 45 Cal.3d 471, 487 [247 Cal.Rptr. 172, 754 P.2d 218] [same].) The instructions clearly state, "If the evidence shows . . . ," and, "If from all the evidence . . . ." These prefatory phrases cannot reasonably be interpreted as meaning defendant had the burden of proof, but instead mean the jury should consider the evidence presented from both sides.

In addition, other instructions made clear that the jury should consider the instructions as a whole, that the People bear the burden of proof generally, and that "no lack of testimony on the defendant's part will supply a failure of proof by the People so as to support a finding against him on any such essential element." Finally, the instructional error was slight and there was no argument from either side concerning diminished capacity. We conclude the error was manifestly harmless.

### 8. *Malice Instructions*

■ Defendant next argues the instructions defining malice aforethought and intent to kill were confusing and contradictory, requiring that we reverse his conviction. His argument is based on the fact that in defining express malice, the jury was informed that "Malice is express when there's manifested an intention unlawfully to kill a human being" (CALJIC No. 8.11), whereas later it was told that "The crime of voluntary manslaughter is the unlawful killing of a human being without malice aforethought when there is an intent to kill." (CALJIC No. 8.40.) Thus, he claims the jury was first told malice is synonymous with the intent to kill but was later told there can be malice without an intent to kill.

Defendant's contention is premised on an overly narrow and simplistic reading of the jury instructions. The definitions of express malice and voluntary manslaughter provided the jury were both correct and any potential conflict was obviated by other, explanatory instructions. For example, although the jury was instructed that an intent to kill is indicative of *express* malice, the jury was also instructed on *implied* malice, which does not require the specific intent to kill. Additional instructions outlined some specific circumstances in which malice is deemed absent although a person

intended to kill the victim, such as heat of passion, sudden quarrel, and adequate provocation. In such situations, the jury was instructed that the crime is manslaughter, not murder.

Although defendant finds potential confusion in the instructions pertaining to homicide, he does so by isolating certain passages without considering the instructions as a whole. Significantly, the jury was instructed "not to single out any certain sentence or individual point or instruction and ignore the others. You are to consider all of the instructions as a whole and are to regard each in the light of all the others." Read together, the instructions adequately define malice and its relationship to the intent to kill. We thus find no error.

### 9. Ineffective Assistance of Counsel

 A criminal defendant is guaranteed the right to the assistance of counsel by both the state and federal Constitutions. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15.) "Construed in light of its purpose, the right entitles the defendant not to some bare assistance but rather to *effective* assistance." (*People* v. *Ledesma* (1987) 43 Cal.3d 171, 215 [233 Cal.Rptr. 404, 729 P.2d 839], italics in original.) In order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was "deficient" because his "representation fell below an objective standard of reasonableness . . . under prevailing professional norms." (*Strickland* v. *Washington* (1984) 466 U.S. 668, 687-688 [80 L.Ed.2d 674, 693-694, 104 S.Ct. 2052]; *Pope, supra*, 23 Cal.3d at pp. 423-425.) Second, he must also show prejudice flowing from counsel's performance or lack thereof. (*Strickland, supra*, at pp. 691-692 [80 L.Ed.2d at pp. 695-696].) Prejudice is shown when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*In re Sixto* (1989) 48 Cal.3d 1247, 1257 [259 Cal.Rptr. 491, 774 P.2d 164]; *Strickland, supra*, at p. 694 [80 L.Ed.2d at p. 698].)

#### a. The Warrantless Entries by Police

 Defendant first contends trial counsel was constitutionally remiss in failing to file a suppression motion based on the two warrantless entries into the Smith/Wharton apartment, first by Officer Rivas and later by Officers Fryslie and Tracy. Defendant argues that these entries violated his right to be free of unreasonable searches and seizures under the Fourth Amendment and that counsel's failure to move to suppress deprived him of an adjudication of the issue, thereby tainting the admission of all the evi-

dence discovered as a result of the entries, including victim Smith's body, defendant's statements to Officer Tonello, and all information elicited from Dr. Hamilton and Dr. Hutcheson.

We reject at the threshold defendant's contention that he is entitled to relief merely because counsel's inaction deprived him of the *opportunity* to challenge the legality of the entry by Officers Rivas, Fryslie and Tracy. ██ "Where defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, the defendant must also prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excluded evidence in order to demonstrate actual prejudice." (*Kimmelman* v. *Morrison* (1986) 477 U.S. 365, 375 [91 L.Ed.2d 305, 319, 106 S.Ct. 2574].) A contrary rule would be inconsistent with our pronouncements in numerous cases requiring a defendant claiming ineffective assistance of counsel to show prejudice resulting from counsel's acts or omissions. (*Ledesma, supra,* 43 Cal.3d at p. 217; *In re Sixto, supra,* 48 Cal.3d at p. 1257.)[11]

██ Defendant's ineffective-assistance claim is premised on his contention that had counsel moved to suppress the evidence gathered as a result of the allegedly illegal entries, the motion "surely would have been" granted. Because such evidence comprised the entire case against him, defendant claims counsel's representation necessarily "fell below an objective standard of reasonableness . . . under prevailing professional norms." (*Strickland* v. *Washington, supra,* 466 U.S. 668, 687-688 [80 L.Ed.2d at pp. 693-694].) Even assuming arguendo counsel was remiss in failing to move to suppress, however, we conclude relief is not appropriate because defendant fails to show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*In re Sixto, supra,* 48 Cal.3d at p. 1257.) In short, we find the suppression motion would have been denied.

██ We begin our analysis with the observation that " 'warrantless searches of a private dwelling are unreasonable per se in the absence of one

---

[11] Defendant relies on *People* v. *Farley* (1979) 90 Cal.App.3d 851 [153 Cal.Rptr. 695, 12 A.L.R.4th 301], wherein the Second District Court of Appeal suggested an ineffectiveness-of-counsel claim was shown when "by reason of counsel's failure to perform the obligations imposed on him, defendant is deprived of an *adjudication* of a crucial or potentially meritorious defense. It is not required that defendant establish that the adjudication would *necessarily* be in defendant's favor." (*Id.* at p. 865, italics in original.) Read in context, however, *Farley* does not stand for the proposition that loss of a mere opportunity to challenge the admission of evidence, without more, is sufficient to establish a prima facie showing of ineffective representation. In any case, later cases make clear that "In addition to showing that counsel's performance was deficient, a criminal defendant must also establish prejudice before he can obtain relief on an ineffective-assistance claim." (*Ledesma, supra,* 43 Cal.3d at p. 217.)

of a small number of carefully circumscribed exceptions.' " (*People* v. *Cook* (1978) 22 Cal.3d 67, 97 [148 Cal.Rptr. 605, 583 P.2d 130], quoting *People* v. *Ramey* (1976) 16 Cal.3d 263, 270 [127 Cal.Rptr. 629, 545 P.2d 1333], cert. den. *sub nom. California* v. *Ramey* (1976) 429 U.S. 929 [50 L.Ed.2d 299, 97 S.Ct. 335].) One established exception to the warrant requirement, however, is when "exigent circumstances" exist to justify a warrantless entry. " ' "[E]xigent circumstances" means an emergency situation requiring swift action to prevent imminent danger or serious damage to property, or to forestall the imminent escape of a suspect or destruction of evidence. There is no ready litmus test for determining whether such circumstances exist, and in each case the claim of an extraordinary situation must be measured by the facts known to the officers.' " (*Lucero, supra,* 44 Cal.3d at p. 1017, quoting *People* v. *Ramey, supra,* at p. 276.) The exception is applicable to the federal Constitution (see *Mincey* v. *Arizona* (1978) 437 U.S. 385 [57 L.Ed.2d 290, 98 S.Ct. 2408]) and "California courts are in full accord with the . . . emergency exception to the warrant requirement." (*Tamborino* v. *Superior Court* (1986) 41 Cal.3d 919, 924 [226 Cal.Rptr. 868, 719 P.2d 242].)

 We conclude the totality of circumstances here demonstrated an emergency situation existed sufficient to justify the entry by Officers Fryslie and Ybarra. Earlier in the month, police had been called to the Smith/Wharton home to quell a domestic disturbance. Later, on the day police discovered victim Smith's body, Officer Rivas was dispatched to the home to locate Linda Smith and found nobody home. Neighbors reported they had not seen Smith in two weeks. There was mail in the mailbox, indicating she had not been home. Rivas left a note inside the apartment asking Smith to call the police. He locked the door behind him as he left the apartment. Later that evening, police received a second call from Smith's aunt in San Francisco voicing additional concern for her welfare. Officer Zuniga responded to the scene but did not attempt an entry. Later that same night, Officer Fryslie was dispatched to the scene (in what he characterized as a "check-the-welfare call") after Mrs. Short, a neighbor, called "911" after she heard someone banging on Smith's front door. Fryslie rang the doorbell and knocked on the door. Receiving no response, he tried the doorknob and discovered the door was unlocked. Announcing his identity, Fryslie entered the apartment behind his police dog. Officer Ybarra accompanied Fryslie into the residence.

As one leading commentator explains, "Doubtless there are an infinite variety of situations in which entry for the purpose of rendering aid is reasonable. Included are those in which entry is made . . . to seek an occupant reliably reported as missing." (2 LaFave, Search and Seizure (2d ed. 1987) § 6.6(a), p. 702.) Courts in both California and other states are in

accord. (See *Lucero, supra,* 44 Cal.3d at pp. 1016-1018 [evidence of missing girls justified warrantless entry]; *People* v. *Mitchell* (1976) 39 N.Y.2d 173 [383 N.Y.S.2d 246, 248-249, 347 N.E.2d 607] [missing chambermaid in hotel; warrantless search of hotel rooms permissible]; *State* v. *Fisher* (1984) 141 Ariz. 227 [686 P.2d 750, 759-764] [manager of apartment house had not been seen for 39 hours; warrantless search permissible]; *Com.* v. *Silo* 1985) 509 Pa. 406 [502 A.2d 173, 175] [neighbors reported victim had not been seen for 24 hours, could not be reached by telephone, and did not show up for work; warrantless search of her home justified].) Because a suppression motion based on the warrantless entry of Officers Fryslie and Ybarra would have been denied because of exigent circumstances, it follows counsel was not ineffective for failing to make the motion.

Defendant contends that even if the entry by Fryslie and Ybarra was justified by an emergency, cutting open the plastic in which the victim's body was wrapped constituted an illegal opening of a closed container which was not justified by any emergency. This theory, however, assumes the emergency which justified the initial entry had terminated. (See *Michigan* v. *Clifford* (1984) 464 U.S. 287 [78 L.Ed.2d 477, 104 S.Ct. 641].) The facts are to the contrary. Upon entering the victim's residence, Officer Fryslie noticed the telephone was unplugged and found the suicide note defendant wrote. These additional suspicious circumstances contributed to the officer's belief that all was not well. When he felt a portion of the plastic wrapping that protruded from the barrel, he radioed his superior that he had found a potential body disposal site. After cutting away the plastic wrapping and discovering the victim's body, the emergency generated by the reports of a missing person ceased (because the probable subject of the reports was no longer living), and the investigating officers left the premises to secure a warrant before continuing their search.

The officers' actions in this case fully comported with Fourth Amendment guarantees. Although defendant urges us to endorse a different result, his rule would have Officers Fryslie and Ybarra vacate the premises despite their well-founded suspicion that they had found the victim's body. Because there existed the possibility that the victim was still alive, we cannot fault the officers' decision to investigate further. We thus find trial counsel's failure to move to suppress based on the officers cutting open the plastic wrapping did not amount to ineffective assistance of counsel.

Defendant finally claims the initial, daytime, warrantless entry by Officer Rivas was not justified by any emergency. While it is true there were fewer indications of an emergency at the time Rivas entered the apartment, we need not resolve this issue because Rivas did not discover any evidence during his entry. As a result, his entry, even assuming it was improper, did

not (1) lead to suppressible evidence, or (2) taint the later entry by Fryslie and Ybarra. (Cf. *Lucero, supra,* 44 Cal.3d at p. 1018 [possibly improper entry by detective of "no significance" because he did not testify at trial].) Counsel thus cannot be faulted for failing to move to suppress on this ground.[12]

### b. *Discovery of the Hammer*

 Defendant also maintains his trial attorney should have moved to suppress the hammer found by the victim's ex-husband, Leighton Smith. The hammer was found, however, during Leighton Smith's examination of the victim's apartment and belongings in his capacity as administrator of her estate. Inasmuch as Leighton Smith found the hammer in his capacity as a private citizen, the Fourth Amendment's prohibition against unreasonable searches and seizures was inapplicable. (*People* v. *North* (1981) 29 Cal.3d 509, 514 [174 Cal.Rptr. 511, 629 P.2d 19].)

Defendant attempts to characterize Leighton Smith as an agent of the police and argues the "private citizen" rationale is thus inapplicable. (See *Dyas* v. *Superior Court* (1974) 11 Cal.3d 628, 633, fn. 2 [114 Cal.Rptr. 114, 522 P.2d 674].) The record does not support his contention. Officer Tonello merely told Leighton Smith, "If you happen to run across a hammer or anything, let me know." From this brief comment, we cannot conclude Tonello "requested [an] illegal search or knowingly allowed it to take place." (*Ibid.*) Indeed, as administrator of the deceased's estate, Leighton Smith's search was not illegal.

### 10. *Prior-murder Special Circumstance*

In 1975, defendant pleaded guilty in Santa Barbara County to second degree murder. This murder supplied the sole special circumstance in the present case. Defendant raises several challenges to the validity of this special circumstance.

### a. *Marsden*

 Defendant first contends his prior murder conviction was invalid because the court that presided over that 1975 trial improperly denied his motion for substitution of counsel. He claims this misstep violated his federal constitutional right to the assistance of counsel. We reject the argument.

---

[12]Because we find no merit to defendant's contention police entered his residence in violation of his Fourth Amendment rights, we decline to address the question whether the evidence was admissible under the inevitable discovery doctrine.

We first note that not only did defendant admit the special circumstance allegation in the present case, he pleaded guilty to second degree murder in the 1975 matter. He thus bears a heavy burden in establishing at this late date that he is entitled to relief because the court in the 1975 case failed to listen to his complaints about counsel. (See *People* v. *Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44].)

Even if defendant could overcome these twin hurdles, however, the claim lacks merit. The record shows that in the prior case, defendant sent a detailed letter to the trial judge explaining why he was unhappy with his trial attorney, Mr. Murphy. Included among these reasons were that Murphy had met only briefly with him, had not discussed several matters in the case with him, never received defendant's complete story about what happened, and had too many cases to give sufficient attention to defendant's case. A hearing was held on August 7, 1975, at which the letter was acknowledged.[13]

In *Marsden, supra,* 2 Cal.3d 118, we held that the right of an accused to the effective assistance of counsel may include the right to have present counsel discharged and substitute counsel appointed. In order to thoughtfully exercise its discretion whether to discharge present counsel, a trial court is required to listen to a defendant's complaints about his attorney. (*Id.* at pp. 123-124.) "[A] judge who denies a motion for substitution of attorneys solely on the basis of his courtroom observations, despite a defendant's *offer to relate specific instances of misconduct,* abuses the exercise of his discretion to determine the competency of the attorney." (*Id.* at p. 124, italics added.)

When the basis of a defendant's dissatisfaction with counsel is set forth in a letter of sufficient detail, however, a full-blown hearing is not required. (*People* v. *Terrill* (1979) 98 Cal.App.3d 291, 298-299 [159 Cal.Rptr. 360].) It appears the root of defendant's complaint was that counsel was not spending enough time on his case due to counsel's workload. A copy of defendant's letter was transmitted to the public defender and we assume defendant was pleased with the results. As in *People* v. *Avalos* (1984) 37 Cal.3d 216 [207 Cal.Rptr. 549, 689 P.2d 121], it appears "[t]he court here was aware of the grounds for defendant's motion and satisfied itself that

---

[13] The minute order states: "Both counsel and defendant present. The defendant's counsel advised the Court that the defendant wished to have another Deputy Public Defender appointed to represent him, and the Court informed the defendant that his letter to that effect would go into the files with a copy to the Public Defender for his attention." This is consistent with a notation on the letter itself, which reads: "Placed in court file after cc Mowrer [the Public Defender] FCD." The trial judge was Judge Floyd C. Dodson. Although it is possible that a *Marsden* hearing took place, the record is vague on the exact nature and extent of the hearing and inquiry into defendant's dissatisfaction with Mr. Murphy.

counsel was in fact adequately prepared although he might not have communicated fully with his client." (*Id*. at p. 231, citing *Terrill, supra*, 98 Cal.App.3d 291, with approval.) Even assuming we can overlook defendant's 1975 guilty plea and his admission of the special circumstance allegation in the instant trial, we perceive no *Marsden* error.

b. *Ineffective Assistance Rendered by Attorney Murphy*

■ Defendant next claims the trial court erroneously denied his motion to strike the special circumstance allegation because his guilty plea in the 1975 proceeding was tainted by a violation of his Sixth Amendment right to counsel. Specifically, he contends defense counsel Murphy was constitutionally ineffective for failing to adequately research the question of whether defendant was competent to waive his constitutional rights and plead guilty. In support, he notes that in his points and authorities to his motion to withdraw the guilty plea, Murphy failed to cite two federal cases holding that a finding of competence to stand trial does not necessarily mean a defendant is competent to waive his rights and plead guilty.

Although defendant unsuccessfully argued below that he was incompetent to plead guilty in the prior proceeding, it does not appear his motion to strike raised the failure to research issue. Assuming we could reach an issue not raised at trial, it is manifest that defendant fails to demonstrate Murphy was constitutionally ineffective. Even were we to find that Murphy did not adequately research the issue, defendant fails to show how this omission prejudiced him. We have previously discussed the standards concerning ineffective assistance of counsel, including the requirement that counsel's alleged act or omission resulted in prejudice. (*Strickland* v. *Washington, supra*, 466 U.S. 668, 687-688 [80 L.Ed.2d 674, 693-694]; *Fosselman, supra*, 33 Cal.3d 572, 584.) Here, defendant does not assert that he lacked the competence to plead guilty in the 1975 proceeding and we cannot merely assume from the existence of evidence showing some mental instability that he was therefore incompetent to waive his constitutional rights.

Defendant's only attempt to show prejudice from Murphy's alleged failure to research the issue is his claim that there was evidence in that prior case which, if believed by the jury, would have resulted in a verdict of voluntary manslaughter. From this, he reasons he was prejudiced by pleading guilty. Defendant's analysis misses the mark. Unless defendant can show he was not competent to plead guilty, Murphy's failure to research the issue could not have resulted in prejudice. Because no evidence is apparent on this record, we reject the point.

Defendant also claims counsel was incompetent for failing to appeal the prior murder conviction. The record, however, is contrary. Murphy filed a

notice of appeal and prepared an affidavit for defendant to sign. He filed an application for the preparation of the record on appeal. Ultimately the trial court denied a certificate of probable cause (see former § 1237.5), effectively ending defendant's ability to further perfect his appeal from a plea of guilty. As is apparent, counsel adequately performed his duties in attempting to appeal the prior conviction.

c. *Boykin/Tahl*

When taking waivers from defendant prior to his 1975 guilty plea, the trial court stated, "At the trial, also, you would have the right to take the witness stand and testify on your own defense if you wanted to, but you could not be compelled to do that, nobody could make you take the witness stand or give any testimony against yourself. So you could either elect not to testify or to testify, whichever you wish. If you elect not to testify, the jury would be instructed that the circumstances could not be held against you. [¶] Now, these are the rights you will enjoy if you proceed with the trial. If you do what you suggest you want to do, plead guilty to second degree murder, you will be giving up all of these rights, you will be waiving them, they will be gone, they will be lost, you won't have them; do you understand that?" Defendant replied, "Yes."

 He now complains these waivers were inadequate to inform him that by pleading guilty he was waiving his right against compelled self-incrimination. He cryptically states the court "failed to inform [him] that the very plea of guilty itself was protected by the privilege as such plea constituted testimony."

 Of course, a criminal defendant must be advised of the constitutional rights—including the right against compelled self-incrimination—he waives when he pleads guilty (*Boykin* v. *Alabama* (1969) 395 U.S. 238 [23 L.Ed.2d 274, 89 S.Ct. 1709]; *In re Tahl* (1969) 1 Cal.3d 122 [81 Cal.Rptr. 577, 460 P.2d 449]), and he may move to strike a prior conviction on the ground that such advisements were not given in the prior proceeding. (*People* v. *Sumstine* (1984) 36 Cal.3d 909 [206 Cal.Rptr. 707, 687 P.2d 904].) Numerous cases, however, establish that the advisement need not be in formalistic language so long as it "effectively communicate[s] to the defendant the essential character of the constitutional privileges which he is waiving, provided that the message does not require resort to inference." (*People* v. *Lucky* (1988) 45 Cal.3d 259, 285 [247 Cal.Rptr. 1, 753 P.2d 1052]; *In re Ibarra* (1983) 34 Cal.3d 277, 285 [193 Cal.Rptr. 538, 666 P.2d 980].)

 As is apparent, the advisement delivered by the trial court in the 1975 action adequately informed defendant of the nature of his right against

compelled self-incrimination as well as the fact that he was giving up that right. The advisement was complete and in simple language. We thus reject defendant's complaint that it was objectionably abbreviated.

Defendant also asserts the prior murder conviction must be set aside because the trial judge in that proceeding did not explain that he could be convicted of manslaughter if he went to trial. Neither *Boykin* v. *Alabama, supra,* 395 U.S. 238, nor *In re Tahl, supra,* 1 Cal.3d 122, requires such a detailed advisement. "The law does not require that an express discussion of the elements of the offense be contained in the transcript [or] even an express statement that the elements have been discussed with counsel." *(People* v. *Dolliver* (1986) 181 Cal.App.3d 49, 61 [225 Cal.Rptr. 920].) Rejecting an argument that an accused must be advised of the technical elements of the charges against him before he may enter a valid plea, we said, "there is no compulsion which requires such explanation and we can discern no persuasive reason for burdening the court with such a requirement." *(In re Ronald E.* (1977) 19 Cal.3d 315, 324-325 [137 Cal.Rptr. 781, 562 P.2d 684].) As in those cases, we see no need for a trial court taking a plea to engage in an in-depth discussion with a defendant regarding the possible outcomes should the accused proceed to trial.

Defendant argues that because there was some evidence that could have supported a verdict less than murder, we should require the trial court to inform defendant of that fact. In support, however, he cites neither authority for such a rule of procedure nor any policy reasons why it would have a salutary effect on the operation of the criminal justice system. We thus decline to adopt such a rule.

d. *Competence to Plead Guilty*

 Defendant next contends his plea to the 1975 murder must be set aside because the trial court did not order, sua sponte, a hearing to determine whether defendant was competent to plead guilty. Although he concedes a jury found him competent to stand trial after a contested hearing only two weeks before his plea, he cites federal authority holding that a higher degree of competence is required to plead guilty than merely to stand trial. (See, e.g., *Sieling* v. *Eyman* (9th Cir. 1973) 478 F.2d 211; see also *People* v. *Burnett* (1987) 188 Cal.App.3d 1314, 1321, fn. 3 [234 Cal.Rptr. 67] [acknowledging *Sieling*].) Because the jury determined only whether defendant was able "to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner" (§ 1367; see generally *People* v. *Hale* (1988) 44 Cal.3d 531 [244 Cal.Rptr. 114, 749 P.2d 769]), and not whether he was able "to make a reasoned choice among the alternatives presented to him and to understand the

nature of the consequences of his plea" (*Sieling, supra,* at p. 215), defendant argues a second hearing should have been held.

We reject defendant's argument and join the majority of courts that have declined to adopt the reasoning in *Sieling* v. *Eyman, supra,* 478 F.2d 211. (See *White Hawk* v. *Solem* (8th Cir. 1982) 693 F.2d 825, 830, fn. 7; *United States* ex rel. *Heral* v. *Franzen* (7th Cir. 1981) 667 F.2d 633, 637-638, and cases cited.) Indeed, as the Seventh Circuit Court of Appeals noted, the *Sieling* court itself has limited the scope of that case. In *Makal* v. *Arizona* (9th Cir. 1976) 544 F.2d 1030, certiorari denied, 430 U.S. 936 [51 L.Ed.2d 782, 97 S.Ct. 1563], the Ninth Circuit Court of Appeals held that a defendant's guilty plea need not be invalidated even where the trial court failed to make a specific and separate finding of competency to plead, so long as "the district court could properly reconstruct the competence of the defendant to plead guilty based upon evidence adduced in determining his competence to stand trial." (*Heral, supra,* 667 F.2d at p. 637, fn. 4.)

Even if we assume for the sake of argument that a slightly higher degree of mental competence is required to plead guilty than to stand trial, we find no error. The trial court was clearly aware of defendant's *alleged* mental problems; it had, after all, recently ordered a hearing to determine defendant's competence to stand trial. After that hearing produced a ruling adverse to defendant, the record shows the court was not convinced defendant was incompetent to plead guilty[14] and defendant fails to point to evidence from which we can conclude the court should have entertained a doubt regarding defendant's competence. Significantly, defendant did not request a second competency hearing before pleading guilty.

Later, in a motion to withdraw the guilty plea,[15] defendant claimed he was "not of sound mind when he entered his plea." Attached to the motion was a declaration by Dr. Stephens, one of the witnesses who testified at the earlier hearing to determine competence to stand trial, in which he opined that defendant "was mentally incompetent and not of sound mind when he entered [his guilty plea]." The declaration, however, did not present any new evidence relevant to the issue of competence to plead guilty. The motion was denied without discussion. (Cf. *People* v. *Kurbegovic* (1982) 138 Cal.App.3d 731, 755, fn. 19 [188 Cal.Rptr. 268] [no error in refusing to

---

[14]After the court accepted the plea but before sentencing, defense counsel gave his closing argument and said, "everybody agrees that Mr. Wharton has . . . serious mental problems." The trial judge broke in and said, "Well, lest my silence be taken as an acquiescence in what you state, let me state that I don't think he has any mental problem." When counsel disagreed, the judge replied that the expert witnesses at the competency hearing merely concluded defendant was "depressed."

[15]Defendant did not rely on the lack of a second hearing in his motion to strike the special circumstance allegation.

reconsider competency decision absent change in circumstances or presentation of new evidence]; *People* v. *Zatko* (1978) 80 Cal.App.3d 534, 548 [145 Cal.Rptr. 643] [same].)

The record thus does not reveal "substantial" evidence that could have led the trial court to doubt defendant's competence to plead guilty. (Cf. *Hale, supra,* 44 Cal.3d at p. 539 [substantial evidence of incompetence to stand trial triggers duty to hold a hearing].) Accordingly, we find the court was under no obligation to hold a second competency hearing.

 We likewise reject defendant's claim the court abused its discretion in failing to allow him to withdraw his guilty plea. Section 1018 permits a trial court to allow a criminal defendant to withdraw his guilty plea "for a good cause shown." However, " 'the withdrawal of such a plea rests in the sound discretion of the trial court and may not be disturbed unless the trial court has abused its discretion.' [Citation.] An appellate court will not disturb the denial of a motion unless the abuse is clearly demonstrated." (*In re Brown* (1973) 9 Cal.3d 679, 685 [108 Cal.Rptr. 801, 511 P.2d 1153], quoting, in part, *People* v. *Francis* (1954) 42 Cal.2d 335, 338 [267 P.2d 8].) It is the defendant's burden to produce evidence of good cause by clear and convincing evidence. (*People* v. *Cruz* (1974) 12 Cal.3d 562, 566-567 [116 Cal.Rptr. 242, 526 P.2d 250].)

Defendant relies on the declaration of Dr. Stephens in urging us to conclude the trial court abused its discretion by denying the motion. This evidence, however, was substantially the same as that presented in defendant's competency hearing and was contradicted by other expert evidence. Because this showing does not constitute clear and convincing evidence that the court abused its discretion in denying the motion, we reject defendant's assertion that reversal is required on that ground.

Inasmuch as defendant provides no elaboration or argument on the point, we also reject his claim that refusal to allow him to withdraw his plea violated his constitutional rights to due process, a fair trial, and to be free of cruel and unusual punishment under the Fifth, Sixth, Eighth and Fourteenth Amendments to the federal Constitution. (*People* v. *Blankenship, supra,* 213 Cal.App.3d 992, 995-996.)

e. *Intent to Kill*

 Although defendant pleaded guilty in 1975 to the second degree murder of Pierce, he contends the prior-murder special circumstance was erroneously sustained against him because there was no showing he intended to kill Pierce. An intent to kill, however, is not an element of the

prior-murder special circumstance. (*People* v. *Malone* (1988) 47 Cal.3d 1, 26 [252 Cal.Rptr. 525, 762 P.2d 1249]; *People* v. *Hendricks* (1987) 43 Cal.3d 584, 595-596 [238 Cal.Rptr. 66, 737 P.2d 1350].)

Because defendant's crime occurred before we filed those two cases construing the prior-murder special circumstance, he contends it would violate his constitutional right to due process under the Fifth Amendment to apply them in this case.[16] ▮▮▮ Both the federal and state Constitutions prohibit the ex post facto application of the laws. (U.S. Const., art. I, §§ 9, 10; Cal. Const., art. I, § 9.) Although these provisions are limitations on the powers of the legislative, not judicial, branch (*Marks* v. *United States* (1977) 430 U.S. 188, 191 [51 L.Ed.2d 260, 264, 97 S.Ct. 990]; *Ross* v. *Oregon* (1912) 227 U.S. 150, 161 [57 L.Ed. 458, 463, 33 S.Ct. 220]), "the principle on which the [ex post facto] Clause is based—the notion that persons have a right to fair warning of that conduct which will give rise to criminal penalties—is fundamental to our concept of constitutional liberty. [Citations.] As such, that right is protected against judicial action by the Due Process Clause of the Fifth Amendment." (*Marks, supra,* at pp. 191-192 [51 L.Ed.2d at p. 265]; see also *Bouie* v. *City of Columbia* (1964) 378 U.S. 347 [12 L.Ed.2d 894, 84 S.Ct. 1697]; *Keeler* v. *Superior Court* (1970) 2 Cal.3d 619, 634 [87 Cal.Rptr. 481, 470 P.2d 617, 40 A.L.R.3d 420].)

Not all judicial interpretations of statutes having a retroactive effect are prohibited, however. The United States Supreme Court has explained that the Fifth Amendment forbids only the retroactive application of an "unexpected" or "unforeseeable judicial enlargement of a criminal statute." (*Bouie* v. *City of Columbia, supra,* 378 U.S. at pp. 353, 354 [12 L.Ed.2d at pp. 899-900].) California case law is in accord. (*Keeler* v. *Superior Court, supra,* 2 Cal.3d at pp. 634-635; *In re Baert, supra,* 205 Cal.App.3d at p. 520 [finding *Anderson*'s overruling of *Carlos* was "an unforeseeable judicial enlargement of a criminal statute," citing *Bouie*]; *Walker* v. *Meehan* (1987) 194 Cal.App.3d 1290, 1303 [240 Cal.Rptr. 171] [new statutory definition "cannot be said to be unexpected or indefensible in reference to previously existing law"].)

We need not in this case even decide whether the interpretation of section 190.2, subdivision (a)(2) in *Hendricks* (*supra,* 43 Cal.3d 584) and *Malone* (*supra,* 47 Cal.3d 1) was unforeseeable, however, because at the time

---

[16] Although we held intent to kill was a necessary element of the felony-murder special circumstance in *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862], we subsequently overruled that decision in *People* v. *Anderson* (1987) 43 Cal.3d 1104 [240 Cal.Rptr. 585, 742 P.2d 1306]. Cases involving the felony-murder special circumstance committed after *Carlos* but before *Anderson*, however, must apply the intent-to-kill requirement. (*In re Baert* (1988) 205 Cal.App.3d 514 [252 Cal.Rptr. 418].)

defendant killed Smith, the law did not require that special circumstance be supported by evidence showing the prior murder was intentional. ▮ The statutory language expressly permits the special circumstance finding if the accused has been previously convicted of second degree as well as first degree murder, and it has long been the rule that one can commit second degree murder without intending to kill so long as malice aforethought may be implied. (*People* v. *Antick* (1975) 15 Cal.3d 79, 87 [123 Cal.Rptr. 475, 539 P.2d 43]; § 188 [malice requires either intent to kill *or* circumstances showing "an abandoned and malignant heart]; 17 Cal.Jur.3d (rev.) Criminal Law, § 201, p. 314 ["implied malice requires no specific intent to kill"].) Because neither *Hendricks* nor *Malone* constituted a judicial enlargement of the statute, no due process concerns are implicated.[17]

*Penalty Phase*

1. *Witherspoon/Witt Error*

After extensive voir dire, the prosecutor successfully challenged prospective juror Wesstrom for cause. ▮ Defendant contends that in granting the challenge, the trial court erred under the principles set forth in *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770]. As he recognizes, however, the high court substantially modified the *Witherspoon* test and established a more lenient standard for excusing jurors for cause in a capital case. (*Wainwright* v. *Witt* (1985) 469 U.S. 412 [83 L.Ed.2d 841, 105 S.Ct. 844].) *Witt* requires that the trial court determine "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " (*Id.* at p. 424 [83 L.Ed.2d at pp. 851-852].) "Under *Witt*, therefore, our duty is to 'examine the context surrounding [the juror's] exclusion to determine whether the trial court's decision that [the juror's] beliefs would "substantially impair the performance of his duties . . ." was fairly supported by the record.' " (*Miranda, supra,* 44 Cal.3d at p. 94, quoting *Darden* v. *Wainwright* (1986) 477 U.S. 168, 176 [91 L.Ed.2d 144, 154, 106 S.Ct. 2464].)

Defendant contends it would be fundamentally unfair to apply the *Witt* standard in this case because both defense counsel and the prosecutor formulated their voir dire questions based on the twin *Witherspoon* standards of "unmistakable clarity" and "automatic" inability to impose the death

---

[17]Defendant argues *People* v. *Malone* (1985) 165 Cal.App.3d 31 [252 Cal.Rptr. 525, 762 P.2d 1249] supports his position, claiming it holds that intent to kill in the prior murder is required to sustain a prior-murder special circumstance. A close reading of that case, however, reveals that it merely held that to sustain a section 190.2, subdivision (a)(2) special circumstance, *the present murder* must be an intentional one. (But see, *ante*, p. 586, fn. 16 [intent to kill not required for felony-murder special circumstance].)

penalty. We perceive no fundamental unfairness to defendant in this case, however, because the prosecutor was held to a *higher* standard and still convinced the trial court to grant his challenge for cause. Defendant's related assertion that employment of the *Witt* test in his case violates (i) the constitutional prohibition against ex post facto application of the laws, as well as (ii) his right to due process, also fails because *Witt* was decided before defendant's trial. In any case, we have applied the *Witt* standard in other cases, finding it " 'make[s] good sense, and because California courts have generally followed the teachings of the high court in determining when a prospective juror properly may be excused for cause because of his views regarding capital punishment.' " (*People* v. *Guzman* (1988) 45 Cal.3d 915, 955 [248 Cal.Rptr. 467, 755 P.2d 917], quoting *People* v. *Ghent, supra,* 43 Cal.3d at p. 767.) We thus reject his ex post facto and due process arguments.

In this case, prospective juror Wesstrom stated he did not think he would vote to impose the death penalty unless it was shown that the accused's death would "benefit" someone. He was equivocal about whether the prosecution could present evidence which could convince him to vote for the death penalty, holding out the theoretical possibility that such evidence existed but expressing skepticism that such evidence could be presented. He did not believe the penological goal of punishment was such a "benefit" and did not believe the death penalty was a solution or penalty that benefited anyone. He opined that he could vote for the death penalty if it could be shown that by doing so he could bring the victim back to life.

When granting the prosecutor's challenge, the trial court noted it was applying the *Witherspoon* standard. It went on to say, however, that "There is absolutely no doubt in my mind and I make a factual determination at this point that the prospective juror's ability to judge the case would be substantially impaired by his beliefs concerning the death penalty." This factual finding as to Wesstrom's state of mind is binding on this court (*Ghent, supra,* 43 Cal.3d at p. 768), and satisfies the dictates of *Witt.* Although Wesstrom did not unequivocally rule out voting for the death penalty, the gist of his answers on voir dire was that he was holding out only a theoretical possibility that evidence could be shown which would convince him to vote for death.[18] Thus, his qualifying of his voir dire answers with the

---

[18] After stating he would "probably" have difficulty voting for death, Wesstrom was asked, "is there anything else Mr. McKinley could do, as a prosecutor, to convince you that the death penalty was the appropriate punishment in any case?" Wesstrom replied, "If he could convince me or anyone else that, in so taking a life there would be a benefit, then I have to accept that possibility . . . does exist. [¶] Why I answered the question [the way] I did by saying 'probably,' because I don't presume to know all the experiences that we could go through. My limited experience, I have never been presented with any evidence to say to me that there has been a benefit by taking another human life. . . ."

word "probably," read in context, does not undermine the trial court's conclusion that Wesstrom's views would "substantially impair" his ability to be impartial. (See *Guzman, supra,* 45 Cal.3d at p. 956 [juror's qualifying voir dire answers with the words "I believe" and "I think" did not undermine court's finding of substantial impairment].)

### 2. *Admission of Rape Victim's Prior Testimony*

The trial court found the victim of defendant's 1975 forcible rape was unavailable as a witness at the penalty phase and thus permitted the prosecution to read her preliminary hearing testimony to the jury. Defendant does not contest the court's ruling on unavailability of the witness but argues his constitutional right to confront the witnesses against him was violated by this procedure. (U.S. Const., 6th Amend.; *Pointer* v. *Texas* (1965) 380 U.S. 400, 403-405 [13 L.Ed.2d 923, 926-927, 85 S.Ct. 1065] [confrontation clause applicable to states]; Cal. Const., art. I, § 15.) Although the requirement of confrontation is a fundamental component of a fair trial, a recognized "'exception to the confrontation requirement [is] where a witness is unavailable and has given testimony at previous judicial proceedings against the same defendant which was subject to cross-examination by that defendant.'" (*People* v. *Louis* (1986) 42 Cal.3d 969, 983 [232 Cal.Rptr. 110, 728 P.2d 180], quoting *Barber* v. *Page* (1968) 390 U.S. 719, 722 [20 L.Ed.2d 255, 258, 88 S.Ct. 1318].)

This exception is reflected in section 1291 of the Evidence Code, which provides that "Evidence of former testimony is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and . . . [t]he party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had *the right and opportunity* to cross-examine the declarant *with an interest and motive* similar to that which he has at the hearing." (Italics added.)

Although defendant had the opportunity to cross-examine rape victim Jane B. at the 1975 preliminary hearing, he claims the objective of the preliminary examination was dissimilar from that in the penalty phase of his capital trial. Quoting *Barber* v. *Page, supra,* 390 U.S. 719, he notes: "A preliminary hearing is ordinarily a much less searching exploration into the merits of a case than a trial, simply because its function is the more limited one of determining whether probable cause exists to hold the accused for trial." (*Id.* at p. 725 [20 L.Ed.2d at p. 260].) This difference, he claims, compels the conclusion that his "interest and motive" when cross-examining the rape victim in the former proceeding was not sufficiently similar to his interest and motive in the present proceeding, and that Evidence Code section 1291 is inapplicable.

The Supreme Court later opined, however, that when a court determines the witness is unavailable, "there may be some justification for holding that the opportunity for cross-examination of a witness at a preliminary hearing satisfies the demands of the confrontation clause." (*Barber* v. *Page, supra*, 390 U.S. at p. 725 [20 L.Ed.2d at p. 260].) Later, in *Ohio* v. *Roberts* (1980) 448 U.S. 56 [65 L.Ed.2d 597, 100 S.Ct. 2531], the high court found the confrontation clause was not violated by the admission of preliminary hearing testimony, when the unavailable witness was actually cross-examined by the defendant in the former proceeding.

■ California law is in accord: "Preliminary hearing testimony is presented in open court, in the presence of the defendant, at a time when the defendant is represented by counsel, in a proceeding in which the defendant has both the motive and the opportunity to cross-examine the witness, and the testimony is reported and preserved in a formal court transcript. In these circumstances the introduction of preliminary hearing testimony at trial, when the witness is legally unavailable, does not violate either the hearsay rule . . . or the defendant's constitutional right of confrontation [citations]." (*People* v. *Guerra* (1984) 37 Cal.3d 385, 427 [208 Cal.Rptr. 162, 690 P.2d 635]; see also *People* v. *Johnson* (1974) 39 Cal.App.3d 749, 755 [114 Cal.Rptr. 545]; *People* v. *Benjamin* (1970) 3 Cal.App.3d 687, 695 [83 Cal.Rptr. 764].)

■ In the present case, the record shows that at the 1975 preliminary hearing on the rape charge, defendant's attorney conducted a searching cross-examination of the rape victim in an attempt to discredit her. Defendant contends that had she been available, he would have attempted, on cross-examination, to develop facts "demonstrating a consistent pattern in [defendant's] mental state from 1975 to the time of the 1986 homicide." It seems doubtful Jane B. would have had this type of information and in any case, such questions would apparently have been outside the scope of the direct testimony.

We conclude defendant had an "interest and motive" at that former hearing sufficiently similar to that which he had in his penalty phase trial, namely, to discredit the witness's account of the crime. Accordingly, admission of the testimony was permissible.

3. *Admission of Autopsy Photos*

■ Over defendant's objection, the trial court admitted three photographs of Pierce, defendant's 1975 murder victim, as he was found by police after his death. Defendant argues the photographs were irrelevant and their admission requires reversal. "The admission of photographs of a victim lies

within the discretion of the trial court, and the exercise of that discretion will not be disturbed on appeal unless the probative value of the photographs is clearly outweighed by their prejudicial effect." (*People* v. *Carrera* (1989) 49 Cal.3d 291, 329 [261 Cal.Rptr. 348, 777 P.2d 121].) We have examined the photographs and find they are not particularly gruesome; indeed, the most graphic picture was excluded by the trial court over the prosecutor's objection. Moreover, the pictures were relevant to corroborate and clarify the testimony of Dr. Rosander, the autopsy pathologist who examined Pierce after the killing. (*Ibid.*)

### 4. Alleged Prosecutorial Misconduct

Defendant contends the prosecutor committed prejudicial misconduct in a variety of ways at the penalty phase of the trial. ■■■ " 'Prosecutorial misconduct implies the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " (*People* v. *Haskett, supra,* 30 Cal.3d 841, 866, quoting *People* v. *Strickland* (1982) 11 Cal.3d 946, 955 [114 Cal.Rptr. 632, 523 P.2d 672].) A defendant's failure to object to curable misconduct, however, waives the issue for appeal. (*People* v. *Lewis* (1990) 50 Cal.3d 262, 282 [266 Cal.Rptr. 834, 786 P.2d 892]; *Lucky, supra,* 45 Cal.3d at p. 293; *Green, supra,* 27 Cal.3d 1 at p. 34.)

### a. Redirect Examination of Detective Cook

Prior to the penalty phase, the parties discussed the admissibility of defendant's confession in the 1975 Pierce killing. In that confession, defendant apparently claimed that he killed Pierce as a result of a homosexual advance the victim had made. Because the confession had been ruled inadmissible on *Miranda* grounds (*Miranda* v. *Arizona, supra,* 384 U.S. 436) in the 1975 case, the prosecutor agreed he would not attempt to introduce that evidence on direct examination. He gave this caveat, however: "if there would be an attempt by the defense to mitigate the murder by showing that [Pierce's killing] . . . was in response to a homosexual lewd-type advance by the victim, then I would be desirous of presenting evidence to negate that." In addition, the prosecutor said he would not ask the detective anything about defendant's confession "but if that comes up through cross-examination, . . . then looking forward to that I want [the court] . . . to be aware of what I would be trying to introduce to rebut the thought that this really wasn't that bad of a murder because the victim had it coming type argument, or he provoked it or started it, or something like that."

In cross-examining Detective Cook, the officer to whom defendant confessed his guilt in the Pierce slaying, defense counsel asked, "During your discussion with Mr. Wharton regarding the rape [of Jane B.], did he at some

time tell you he was responsible for the murder of Mr. Pierce?" Cook replied, "Yes, he did." On redirect, the prosecutor then elicited, over objection, the balance of defendant's admission of guilt.[19] Defendant claims this was misconduct.

 To the extent defendant is now claiming the prosecutor's line of questioning was improper because of the earlier *Miranda* violation, his claim fails because he did not object on that ground. (*Lewis, supra,* 50 Cal.3d at p. 282.) Defendant argues it is "sheer sophistry" to require an objection when the prosecutor had just informed counsel (outside the presence of the jury) that Cook had been instructed not to mention the previously suppressed evidence. The record, however, shows that although the prosecutor agreed *he* would not elicit the information, he reminded the court that should *defendant* bring out such information, he would as well in order to rebut any adverse inferences generated by the officer's testimony. Under these circumstances, we cannot excuse defendant's failure to make a timely *Miranda* objection.

Defendant also argues that he was improperly lured into asking Detective Cook whether defendant had accepted responsibility for the Pierce killing because defense counsel had asked the same question of another witness and failed to provoke the same response from the prosecutor. He claims this tactic violated his right to due process.

We perceive no error. By eliciting evidence that defendant had accepted responsibility for the Pierce killing, defendant presented evidence from which the jury could infer that his moral culpability for that crime was somewhat reduced. On redirect, the prosecutor was entitled to rebut that

---

[19] "Q. [By the prosecutor, Mr. McKinley] Did he tell you why he did it or how he did it?

"A. [By the witness, Detective Cook] He told me why he did it and he told me how he did it.

"Q. What did he say?

"A. He told me that Mr. Pierce solicited him for a homosexual activity. In fact, the comment that—

"MR. DUVAL [defense counsel]: I am going to object to this as being beyond the scope of the cross-examination.

"THE COURT: Overruled.

"Q. BY MR. MCKINLEY: Go ahead.

"A. The comment that precipitated his action is Pierce had said to him, 'I bet you would be great in bed.' [¶] And he said, 'Nobody talks to me that way. Nobody. Nobody.' [¶] And he said he kicked him. He fell down. He continued to kick him. He said, 'He never said anything to me except Mr. Pierce said, "I can't breathe." ' [¶] He continued to kick him in the head and kick him and kick him and kick him, and that's what he said to me.

"Q. Did Mr. Wharton indicate he took any property from Mr. Pierce?

"A. Yes, he did.

"Q. Did that include a watch?

"A. Yes."

inference with evidence of the entire conversation, revealing that defendant's admission of guilt was not an admirable expression of remorse but was instead made under circumstances showing a false and morally objectionable sense of personal justification. "Where part of . . . [a] conversation . . . is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party." (Evid. Code, § 356.)

b. *Arguing Facts Not in Evidence*

During his closing argument, the prosecutor said: "Mercy and sympathy I mention. How long did the defendant consider mercy and sympathy? He is going to ask you for mercy and sympathy. Did he? No. He beats Pierce to death and his mercy and sympathy is to steal his watch and his money . . . . [H]ow much mercy or sympathy did he show to anybody ever?" The prosecutor returned to this theme a bit later, remarking that defendant showed "No remorse or sorrow, which I would like you to consider when Mr. Duval [defense counsel] asks you to be sympathetic or show mercy. The defendant didn't." Later, the prosecutor asked, "How much mercy or sympathy did he show? None."

█ Defendant argues that by making this argument, the prosecutor committed prejudicial misconduct by arguing facts not in evidence. At the threshold, we note there was no objection, thus waiving the issue on appeal. (*Lewis, supra*, 50 Cal.3d at p. 282.) In any case, a lack of remorse was a permissible inference from the evidence. "[T]he prosecutor has a wide-ranging right to discuss the case in closing argument . . . [but may not] argue facts or inferences not based on the evidence presented." (*Lewis, supra*, 50 Cal.3d at p. 283.) Moreover, the prosecutor's argument did not constitute an inappropriate suggestion that defendant's failure to confess was a factor in aggravation. (*People v. Keenan* (1988) 46 Cal.3d 478, 509 [250 Cal.Rptr. 550, 758 P.2d 1081]; *Ghent, supra*, 43 Cal.3d at p. 771.) Although lack of remorse is not a statutory aggravating factor (see *People v. Boyd* (1985) 38 Cal.3d 762, 773 [215 Cal.Rptr. 1, 700 P.2d 782] [aggravating factors under the 1978 death penalty law limited to those set forth in the statute]), "[t]he prosecutor may suggest that evidence of remorselessness, or an absence of evidence of remorse, weighs against the finding of remorse as a *mitigating* factor." (*Keenan, supra*, 46 Cal.3d at p. 510; *People v. Morales* (1989) 48 Cal.3d 527, 570 [257 Cal.Rptr. 64, 770 P.2d 244].) The prosecutor's argument did not overstep these bounds.

Defendant also claims lack of remorse is too speculative a factor on which to base a death sentence. We have held, however, that "[t]he concept of remorse for past offenses as a mitigating factor sometimes warranting less

severe punishment or condemnation is universal." (*Ghent, supra,* 43 Cal.3d at p. 771.) It follows that the *lack* of remorse is also relevant.

### c. *Future Dangerousness*

■ Defendant complains of three lines of inquiry initiated by the prosecutor which allegedly informed the jury that defendant would be a danger to others in prison. He claims this evidence ran afoul of the prohibition against expert predictions of future dangerousness. (*Murtishaw, supra,* 29 Cal.3d at pp. 767-775.) Because defendant failed to object, however, any error is waived. (*People* v. *Thompson* (1988) 45 Cal.3d 86, 124 [246 Cal.Rptr. 245, 753 P.2d 37].)

Even assuming we reach the issue, however, no error is apparent. When questioning Dr. Hamilton, one of defendant's two psychotherapists, the prosecutor asked whether another inmate or prison guard would be safe in the same cell with defendant. She replied she did not know. This obviously falls short of a prohibited expert prediction of future dangerousness. Similarly, when questioning Dr. Patterson, the defense expert, the prosecutor asked him to comment on another doctor's assessment that if defendant "misperceives that he is cornered, then there is a great potential for immediate[,] impulsive, violent behavior." Dr. Patterson, however, stated unequivocally that it would be safe to place defendant in a cell with another inmate. Again, there was no expert prediction of future violence. Finally, a prison official provided some testimony concerning overcrowding in prisons. The prosecutor later told the trial court (outside the presence of the jury) that the questions were intended to show defendant would not be alone in his cell. However, the leap of logic required to jump from that information to a conclusion of future dangerousness is so large that we cannot conclude it is equivalent to an expert's prediction of defendant's future behavior.

### d. *Converting Mitigating Evidence Into Aggravating Evidence*

When cross-examining Dr. Hamilton, the prosecutor asked her to explain what she meant by "atypical impulse control." After explaining it describes a person who is impulsively and uncontrollably aggressive, the prosecutor asked whether "It could happen right now?" She replied, "Possibly." He continued: "Mr. Wharton might go off the handle and fly over Mr. Duval and pop Detective Tonello here?" She admitted it was possible.

■ Defendant claims that by this questioning, the prosecutor improperly attempted to convert mitigating evidence into aggravating evidence. He waived this issue, however, by failing to object. (*Lewis, supra,* 50 Cal.3d at

p. 282.) In any case, the prosecutor was allowed to explore implications raised by defendant on direct questioning; having raised the issue of atypical impulse control, defendant could not insist on immunity from cross-examination on the subject. (See *People* v. *Gates* (1987) 43 Cal.3d 1168, 1211 [240 Cal.Rptr. 666, 743 P.2d 301].)

### e. *Alleged Misconduct in Cross-examination of Defense Witnesses*

Defendant next argues the prosecutor committed misconduct when questioning Dr. Hamilton about possible stressors which could lead to defendant acting out in a violent manner. The prosecutor twice asked the witness whether being raped at knife point (as Jane B. had been) was a stressor. Both times the defense counsel objected and both times the trial court sustained the objection. Thus, even assuming the prosecutor committed misconduct, there was no prejudice.

When cross-examining Lucy Bross, the custodian of records for the Department of Corrections, the prosecutor elicited the information that defendant served only six years for the 1975 rape and murder convictions although he was sentenced to consecutive life terms. Defendant claims this was prejudicial error because it suggested the jury should impose the death penalty because defendant's punishment for past wrongs had not been severe enough. In addition, Bross revealed that defendant had several in-prison disciplinary infractions. Defendant claims this evidence was inadmissible because none of the incidents involved violence. (See § 190.3, factor (b).) Finally, the prosecutor elicited from Bross that defendant had violated his parole by living with a woman in Lompoc instead of with his sister in Santa Barbara. Defendant claims this constituted prosecutorial misconduct because defendant's conduct did not involve violence.

Because defendant failed to object to the questions he now condemns, he waived the issues for appeal. To the extent the challenged questions elicited otherwise inadmissible, nonstatutory aggravating evidence (*Boyd, supra,* 38 Cal.3d at p. 775), there was manifestly no prejudice in light of the other, properly admitted aggravating evidence. (See *People* v. *Wright* (1990) 52 Cal.3d 367, 427-429 [276 Cal.Rptr. 731, 802 P.2d 221].)

Defendant also complains that the prosecutor asked Dr. Patterson on cross-examination whether defendant's prior murder of Pierce and rape of Jane B. fell within the ambit of section 190.3, factor (b), i.e., "the presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence." Defense counsel objected but his objection was overruled and Dr. Patterson was permitted to answer. We agree this question was beyond the scope of both the direct testimony and the

witness's expertise. The error, however, was harmless. Defendant admitted his guilt of those prior crimes and they indisputably come within the scope of section 190.3, factor (b). Moreover, Dr. Patterson's answers were quite evasive and thus not particularly damaging. The jury's reception of Dr. Patterson's opinion on that subject was thus harmless.

When questioning Dr. Patterson, the prosecutor also asked him whether rape and robbery often occur together in the same criminal episode. Defendant correctly contends this was beyond the scope of Dr. Patterson's expertise. There was, however, no objection, and in any case, Patterson replied that he did not know.

Defendant finally complains the prosecutor committed misconduct by asking about (i) the robbery of Jane B. (because the robbery count had been dismissed), (ii) a change in state law regarding the admissibility of psychiatric testimony about premeditation and deliberation, and (iii) the reasons for the change. In addition, defendant challenges the prosecutor's comments that it is "just . . . a matter of self-defense" for the district attorney to "get a psychiatrist down to the police station to examine [a recently arrested] person." As to these matters, the failure to object waived any error and any prejudice flowing from such questions and comments on such tangential matters was negligible.

### f. *Demeanor Evidence*

In closing argument, the prosecutor invited the jury to consider defendant's demeanor at trial as evidence of his mental condition. "[Y]ou've heard him, what he sounds like and sat there and watched him. He is responsible for his acts." Defendant now asserts this was prosecutorial misconduct requiring reversal. There was no objection, however, and in any case, no error. When a defendant places his character in issue at the penalty phase of a capital trial, it is "proper for the jury to draw inferences on that issue from their observations of defendant in the courtroom and therefore proper for the prosecutor to base a closing argument on such observations." (*People* v. *Heishman* (1988) 45 Cal.3d 147, 197 [246 Cal.Rptr. 673, 753 P.2d 629].)

### 5. *Testimony of Dr. Patterson*

The night of his arrest for the rape of Jane B., defendant was examined by Dr. Patterson, a physician specializing in psychiatry. The People called Dr. Patterson to the stand in the penalty phase of defendant's capital trial and, over objection, elicited details of defendant's confession that he had killed Pierce. Defendant contends admission of this evidence

was error for two reasons. First, he claims it violated his *Miranda* rights because the same evidence was suppressed on similar grounds by the trial court presiding over his 1975 prosecution for murder and rape. The record fails to support defendant on this point. Much of the record of the 1975 case was destroyed in accordance with court policy. What survives, however, shows defendant's motion to suppress Dr. Patterson's testimony at the preliminary hearing was *denied* because it was defendant who called Patterson to the stand. A later minute order reveals defendant's confession to Detective Cook was ordered suppressed by the superior court; there is no mention in the order of the confession to Dr. Patterson.

Defendant contends that because his motion to suppress his confessions to both Cook and Patterson was denied by the magistrate at the preliminary examination, "it is reasonable to conclude that the same motion to suppress was made in superior court." We fail to perceive the reasonableness of this assumption and decline to speculate whether defendant renewed his motion to suppress the confession to Dr. Patterson. Because defendant called Dr. Patterson to the stand as a defense witness at the preliminary hearing, the magistrate correctly ruled defendant could not then move to suppress the evidence. Under these circumstances, it is more likely defendant abandoned this claim in superior court because it was obviously meritless. Moreover, defendant may have decided against renewing the motion because there was no evidence of a *Miranda* violation; we note Dr. Patterson testified at the penalty phase that before he questioned defendant, he read him his *Miranda* rights and defendant waived them.

Second, defendant argues Dr. Patterson's testimony should have been excluded from the penalty phase because it was irrelevant, cumulative of other evidence, and more prejudicial than probative. (Evid. Code, § 352.) As the trial court held, however, the evidence of the circumstances of Pierce's slaying was relevant to rebut the implication raised by other defense evidence that defendant became impulsively violent only when placed in a stressful situation.[20] Defendant's confession to Dr. Patterson arguably showed that when defendant killed Pierce, he was not under any particular stressor, thus tending to negate other defense evidence suggestive of brief reactive psychosis, i.e., a temporary loss of contact with reality when faced with a stressful situation. Although this was not the only inference which could be drawn from Dr. Patterson's testimony (one could, for example, argue that Pierce's homosexual remark caused defendant to experience stress), the existence of other, contrary inferences only affects the weight, not the admissibility, of the evidence.

---

[20] There was evidence that when defendant raped Jane B., his girlfriend had just suffered a miscarriage. Also, the defense suggested that defendant killed Linda Smith in the course of an ongoing domestic dispute.

Defendant contends this evidence was cumulative of that given by Detective Cook. Even assuming that to be true, we fail to see the prejudice, especially in light of the fact that defendant admitted killing Pierce and raping Jane B., pursuant to his 1975 guilty plea. Although the trial court did not make an express statement announcing it had balanced the probative value of Patterson's proposed testimony with its prejudicial effect (see *Green, supra*, 27 Cal.3d at p. 25 [record must affirmatively show trial court conducted proper weighing of factors]), the record clearly shows the court was aware of its duty under Evidence Code section 352 and properly discharged its legal obligation. The court announced that although it was denying the Evidence Code section 352 motion, the prosecutor was limited to its offer of proof and could not ask more detailed questions regarding defendant's alleged homosexual activities. Under these circumstances, we think the record shows the trial court properly exercised its discretion. (*People* v. *Griffin* (1988) 46 Cal.3d 1011, 1028 [251 Cal.Rptr. 643, 761 P.2d 103].) Because we find no error, we also reject defendant's Eighth Amendment claim that admission of Dr. Patterson's testimony unconstitutionally affected the reliability of the death sentence.

6. *Alleged Instructional Errors*

a. *Accomplice Instructions*

■ Defendant contends the trial court should have instructed the jury sua sponte that the persons who were involved with defendant in selling the victim's property and cashing her checks after her death (Barney, Dennis, and the Perez brothers) were accomplices, and that, accordingly, their testimony must be corroborated before it could be considered at the penalty phase. He is mistaken. "An accomplice is . . . one who is liable to prosecution *for the identical offense* charged against the defendant on trial in the cause in which the testimony of the accomplice is given." (§ 1111, italics added.) Because none of these people was liable for the victim's murder, it follows none was an accomplice and no instruction to that effect was necessary.

Defendant claims that because the prosecutor argued these persons assisted defendant in stealing from the victim *before* her death, they were thus accomplices in the homicide. Even if we accept defendant's characterization, however, none of these witnesses testified at the penalty phase and the prosecutor did not rely on their testimony in the penalty phase. There was thus no prejudice even if we assume error.

b. *Transcript Testimony*

■ The testimony of Dr. Rosander, the pathologist who conducted the autopsy in the Pierce killing, and the testimony of Jane B., the 1975 rape

victim, were presented to the jury from trial transcripts as both witnesses were unavailable at the time of trial. Defendant maintains the trial court erred in failing to instruct the jury sua sponte that it was to consider this evidence as if it were given live, subject to "the same rules" applicable to live witnesses. (See CALJIC No. 2.12.)[21] Even if the omission was error, however, no prejudice is apparent and defendant does not suggest how he was harmed by the omission other than to make the unsupported claim that the instruction was "vital for the jury's proper consideration of the transcript testimony."

### c. *Deterrent Effect and Financial Cost of the Death Penalty*

■ Defendant next insists the court erred in refusing his requested instruction informing the jury it should not consider the potential deterrent effect or financial cost of a sentence of life imprisonment without the possibility of parole. We have previously rejected this argument in *Thompson, supra*, 45 Cal.3d at page 132, and defendant fails to present any reason to reconsider that decision.

### d. *CALJIC No. 2.10*

■ The trial court indicated that it intended to give CALJIC No. 2.10[22] to the jury, but through an apparent oversight it failed to deliver the instruction. Defendant claims this omission constituted reversible error. Even assuming error occurred, it was harmless. The most damaging statements defendant made to Dr. Hamilton concerned his state of mind prior to the killing. This evidence, however, was not admitted for the limited purpose of showing the basis of Dr. Hamilton's diagnosis. It was instead admitted as direct evidence of defendant's state of mind, relevant to the issues of premeditation and deliberation.

Unlike defendant's statements to Dr. Hamilton, his statements to Dr. Patterson concerning his guilt of the Pierce murder were admitted for the limited purpose of showing the basis of the doctor's diagnosis. Any

---

[21] At the time of defendant's trial, CALJIC No. 2.12 (4th ed.) provided: "In this case testimony given by a witness at a prior proceeding who was unavailable at this trial has been read to you from the reporter's transcript of that proceeding. You are to consider such testimony in the same light and in accordance with the same rules which you have been given as to testimony of witnesses who have testified here in court."

[22] CALJIC No. 2.10 states: "There has been admitted in evidence the testimony of a medical expert of statements made to him by the defendant in the course of an examination of the defendant which was made for the purpose of diagnosis. The testimony of such statements may be considered by you only for the limited purpose of showing the information upon which the medical expert based his opinion. Such testimony is not to be considered by you as evidence of the truth of the facts disclosed by defendant's statements."

prejudice resulting from the possibility the jury improperly considered this evidence was marginal, however, in light of defendant's admission of his guilt in the Pierce murder and Detective Cook's testimony reiterating defendant's confession. We thus find no prejudice resulted from the omission of the instruction.

### e. *Failure to Reinstruct the Jury*

■ Defendant claims the trial court committed reversible error when it failed to repeat certain guilt phase instructions at the penalty phase. (See CALJIC Nos. 1.03 [jury should not make independent investigations], 2.13 [consideration of prior inconsistent statements], 2.20 [credibility of witnesses], 2.70 & 2.71 [viewing oral admissions with caution].) Because none of these instructions was, by its terms, limited to the guilt phase, and because no penalty phase instructions contradicted those instructions, "we believe a reasonable jury would correctly assume those 'generic' instructions continued to apply." (*People* v. *Brown* (1988) 46 Cal.3d 432, 460 [250 Cal.Rptr. 604, 758 P.2d 1135]; *People* v. *Williams* (1988) 45 Cal.3d 1268, 1321 [248 Cal.Rptr. 834, 756 P.2d 221].)

### f. *"Special Instruction II"*

■ In addition to several other special penalty phase instructions, the court, at defendant's request, informed the jury that "You must find a mitigating circumstance exists if there is any substantial evidence to support it."[23] Defendant claims this improperly placed on him the burden of proving the existence of mitigating circumstances by substantial evidence, thereby violating the Eighth Amendment's proscription against limiting the jury's consideration of any relevant mitigating information that may convince it to impose a sentence less than death. (*Blystone* v. *Pennsylvania* (1990) 494 U.S. 299, 308 [108 L.Ed.2d 255, 265, 110 S.Ct. 1078]; *McCleskey* v. *Kemp* (1987) 481 U.S. 279, 305-306 [95 L.Ed.2d 262, 287, 107 S.Ct. 1756].)

---

[23]The entire instruction states: "The mitigating circumstances that I have read for your consideration are given to you merely as examples of some of the factors that you may take into account as reasons for deciding not to impose a death sentence in this case. You should pay careful attention to each of those factors. Any one of them may be sufficient, standing alone, to support a decision that death is not the appropriate punishment in this case. But you should not limit your consideration of mitigating circumstances to these specific factors. [¶] You may also consider any other circumstances relating to the case or to the defendant as shown by the evidence as reasons for not imposing the death penalty. [¶] A mitigating circumstance does not have to be proved beyond a reasonable doubt to exist. You must find that a mitigating circumstance exists if there is any substantial evidence to support it. [¶] Any mitigating circumstance presented to you may outweigh all the aggravating factors. [¶] You are permitted to use mercy, sympathy, or sentiment in deciding what weight to give each mitigating factor."

We find the challenged instruction consistent with Eighth Amendment guarantees. At the heart of defendant's interpretation of "Special Instruction II" is his assumption that it precludes the jury's consideration of a mitigating circumstance unless he establishes its existence by a certain standard of proof. Interpreting the instructions as a whole and as would a reasonable juror, we find defendant's proposed interpretation is unreasonable. The entire special instruction, read in context, is clearly favorable to defendant, informing the jury to give him the benefit of any doubt it may have regarding the appropriateness of the death penalty. In short, we find nothing in the instruction preventing the jury from considering a mitigating circumstance no matter how strong or weak the evidence is.

## 7. *Admission of Stale Evidence*

■ Defendant next contends the testimony from the witnesses who testified about the facts surrounding his 1975 murder of Pierce and rape of Jane B. should have been excluded because that evidence was stale, thus impinging on his ability to adequately test its reliability. He claims the admission of this evidence implicates his rights under the Eighth Amendment, as well as his Fifth Amendment right to due process. Defendant has no explanation, however, why we should not conclude he waived the issue by his failure to object on this ground at trial.

In any case, the claim is patently meritless. Unlike *Gardner* v. *Florida* (1977) 430 U.S. 349 [51 L.Ed.2d 393, 97 S.Ct. 1197], cited in support, in which a capital defendant was sentenced to death due in part to the trial court's reliance on a sentencing report, the contents of which were not revealed to defense counsel, the mere passage of time between defendant's 1975 crimes and his capital trial did not significantly diminish his ability to challenge the evidence in question. First, as required by section 190.3, factor (c), the prior crimes were established by convictions. Second, defendant pleaded guilty to those crimes and admitted the truth of the special circumstance in the present case. Third, the jury was instructed that aggravating circumstances—including the existence of prior felony convictions—must be proved beyond a reasonable doubt. Finally, although defendant complains of his inability to effectively confront the witnesses because of the passage of time, we note he had notice of this evidence (§ 190.3, par. 4) and cross-examined those witnesses that were available. In short, we find no constitutional error.

## 8. *Double Jeopardy and the 1975 Crimes*

Defendant claims the People were permitted to relitigate his 1975 crimes in violation of the constitutional proscription against placing a criminal

defendant twice in jeopardy. (U.S. Const., Amend. V; Cal. Const., art. I, § 15.) We have previously rejected this claim (*People* v. *McDowell* (1988) 46 Cal.3d 551, 568 [250 Cal.Rptr. 530, 758 P.2d 1060]; *People* v. *Melton* (1988) 44 Cal.3d 713, 756, fn. 17 [244 Cal.Rptr. 867, 750 P.2d 741]), and defendant does not present persuasive reasons why we should reconsider those decisions.[24]

### 9. *Defendant's Right to Be Present*

Defendant claims he was denied his constitutional and statutory right to be present on numerous occasions during trial. Specifically, he claims he was excluded from the following in-chambers proceedings: meetings (i) to question Drs. Hutcheson and Hamilton about their proposed testimony, (ii) to question a juror concerning a conversation she had with a former employee of the district attorney's office, (iii) to discuss Dr. Hamilton's notes regarding the alleged prior burglary, (iv) to discuss the appropriate guilt phase jury instructions, (v) to discuss a note from a juror requesting a cassette tape player in order to listen to a tape introduced into evidence, (vi) to question a juror, during the penalty phase, regarding his attendance at a planned retirement dinner being held for one of the prosecution witnesses, (vii) to discuss the proposed reading of the preliminary hearing transcript of Jane B.'s testimony, (viii) to discuss the prosecution's proposed cross-examination of Dr. Patterson, (ix) to discuss the appropriate penalty phase jury instructions, and (x) on two occasions, to discuss possible responses to notes received from the jury. In all instances, there was either an express or an implied waiver of defendant's presence given by counsel.

A criminal defendant " 'is not entitled to be personally present either in chambers or at bench discussions which occur outside of the jury's presence on questions of law or other matters in which a defendant's presence does not bear a "reasonably substantial relation to the fullness of his opportunity to defend against the charge." ' " (*People* v. *Bittaker* (1989) 48 Cal.3d 1046, 1080 [259 Cal.Rptr. 630, 774 P.2d 659], quoting *People* v. *Jackson* (1980) 28 Cal.3d 264, 309-310 [168 Cal.Rptr. 603, 618 P.2d 149].) As is obvious, none of the challenged instances of defendant's absence was of sufficient importance such that defendant's personal presence was

---

[24] *Bullington* v. *Missouri* (1981) 451 U.S. 430 [68 L.Ed.2d 270, 101 S.Ct. 1852], cited in support, is inapposite because that case involved a retrial of the same penalty phase after the defendant's new trial motion was granted. Having received life imprisonment in the first trial, the United States Supreme Court held double jeopardy principles precluded the state from seeking the death penalty in the second penalty trial. *Bullington* is obviously distinguishable from this case, however, because here the People do not seek to punish defendant anew for his 1975 crimes.

required to ensure a fair and impartial trial. Because he fails to demonstrate how he was prejudiced or denied a fair trial, we reject his claim of constitutional error.

### 10. Other Claims

Defendant makes a host of additional claims that we have addressed and rejected in other cases. ██ First, he argues we should provide intercase proportionality review, comparing the facts of his case to other cases in which the death penalty was imposed. He argues that such review is required by both the state and federal Constitutions. He is mistaken. (*People v. Caro* (1988) 46 Cal.3d 1035, 1068 [251 Cal.Rptr. 757, 761 P.2d 680]; see *Pulley v. Harris* (1984) 465 U.S. 37 [79 L.Ed.2d 29, 104 S.Ct. 871].)

Defendant also maintains that even if no single error compels reversal, the cumulative effect of all the errors requires reversal. Because we do not agree with defendant that multiple errors occurred in his trial, no cumulative prejudice appears. Defendant also argues that in the many instances of asserted prosecutorial misconduct when defense counsel failed to object, we should overlook the failure to object and find the issue cognizable on appeal. (See *People v. Frank* (1985) 38 Cal.3d 711, 736-737 [214 Cal.Rptr. 801, 700 P.2d 415] [Bird, C. J., conc. & dis. opn.].) We have previously rejected this notion (*Miranda, supra,* 44 Cal.3d at p. 108, fn. 30) and, as explained, *ante,* even had counsel timely objected, no prejudicial misconduct occurred.

Defendant finally contends that various flaws in the capital sentencing process render his death sentence arbitrary and capricious in violation of the Eighth Amendment of the federal Constitution, and his right to due process under both the state and federal Constitutions. He recognizes that this court has rejected identical claims in the past and presents no persuasive reason why our previous decisions were in error. He admits he is raising these issues because the federal courts have yet to resolve some of them. We thus adhere to our decisions in *People v. Coleman* (1989) 48 Cal.3d 112, 160 [255 Cal.Rptr. 813, 768 P.2d 32], and *People v. Rodriguez* (1986) 42 Cal.3d 730 [230 Cal. Rptr. 667, 726 P.2d 113]. ██ We likewise reject defendant's insistence that the trial court erred by failing to instruct, sua sponte, that a term of life imprisonment without the possibility of parole means that defendant will never be paroled. (*People v. Bonin* (1988) 46 Cal.3d 659, 698 [250 Cal.Rptr. 687, 758 P.2d 1217].) In any case, defendant's jury was instructed that "life without the possibility of parole means exactly what it says: The defendant will be imprisoned for the rest of his life."

CONCLUSION

The judgment is affirmed in its entirety.

Panelli, J., Arabian, J., and Baxter, J., concurred.

**MOSK, J.**—I dissent.

Plainly, the evidence is insufficient to support the jury's verdict finding defendant guilty of first degree murder on the sole theory presented by the prosecution—willful, deliberate, and premeditated murder. Specifically, it is insufficient as to premeditation and deliberation.

When a court assesses the sufficiency of the evidence, its "task is to determine whether a reasonable trier of fact could have found that the prosecution sustained its burden of proving the defendant guilty beyond a reasonable doubt. [Citation.] The judgment must be supported by 'substantial evidence,' which has been defined as evidence that 'reasonably inspires confidence and is of "solid value." ' " (*People* v. *Morris* (1988) 46 Cal.3d 1, 19 [249 Cal.Rptr. 119, 756 P.2d 843].) The term "substantial evidence," of course, means solid *evidence* and not mere speculation. In any given case, a court "may *speculate* about any number of scenarios that may have occurred . . . . A reasonable inference, however, may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work. . . . A finding of fact must be an inference drawn from evidence rather than . . . a mere speculation as to probabilities without evidence." (*Id*. at p. 21, italics in original, internal quotation marks and paragraph sign omitted.)

In *People* v. *Anderson* (1968) 70 Cal.2d 15 [73 Cal.Rptr. 550, 447 P.2d 942], we stated: "The type of evidence which this court has found sufficient to sustain a finding of premeditation and deliberation falls into three basic categories: (1) facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing—what may be characterized as 'planning' activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed' [citation]; (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed

according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2).

"Analysis of the cases will show that this court sustains verdicts of first degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3)." (70 Cal.2d at pp. 26-27, italics in original.)

It is plain that a rational trier of fact could not have found defendant guilty beyond a reasonable doubt of willful, deliberate, and premeditated murder: premeditation and deliberation were not proved beyond a reasonable doubt. Indeed, the evidence of these two elements is practically nonexistent, and is certainly far too insubstantial to support a finding *beyond a reasonable doubt*. At most, the record supports an inference that the killing resulted from an explosion of violence without significant forethought or reflection on the part of defendant.

Specifically, there is no substantial evidence that defendant planned his attack. In support of their opposite conclusion, the majority present what they label "possible scenario[s]" (maj. opn., *ante*, at p. 547) assertedly indicative of planning. Those "scenarios" rest on a crucial factual assumption, to wit, that a hammer, which was the likely murder weapon, was missing from a toolbox in a garage and was taken from that location not long before the fatal attack. (See maj. opn., *ante*, at p. 547.) That assumption, however, is unsupported. *There is simply no evidence whatever that the hammer* BELONGED *in the toolbox. Nor is there any evidence whatever that it had been removed* RECENTLY. The majority derive their "scenarios" from an unconventional source: argument made by the prosecutor and not from evidence adduced by the parties. (See maj. opn., *ante*, at pp. 547-548.) The prosecutor's argument may have encouraged jury speculation that defendant planned the killing. But neither a prosecutor's argument nor "speculation" is "evidence," less still "*substantial* evidence."

Next, there is no substantial evidence that defendant had a motive to kill. In support of their opposite conclusion, the majority again turn not to evidence but to the prosecutor's argument. (See maj. opn., *ante*, at pp. 547-548.) It is possible to indulge in speculation that defendant had a motive— but it is elementary that "speculation" is not "evidence."

Finally, there is no substantial evidence that defendant employed a manner of killing that indicates a preconceived design to kill in a certain way.

The majority expressly concede as much. (Maj. opn., *ante*, at p. 548.) In this they do only what necessity demands: it is pellucid that substantial evidence on the point is lacking.[1]

Therefore, the evidence is insufficient to support the jury's verdict finding defendant guilty of willful, deliberate, and premeditated murder. The conviction must accordingly be reversed. And retrial on the underlying charge is barred by the double jeopardy clause of the Fifth Amendment as applied to the states through the due process clause of the Fourteenth Amendment. (See, e.g., *People* v. *Pierce* (1979) 24 Cal.3d 199, 209-210 [155 Cal.Rptr. 657, 595 P.2d 91], following *Burks* v. *United States* (1978) 437 U.S. 1 [57 L.Ed.2d 1, 98 S.Ct. 2141], and *Greene* v. *Massey* (1978) 437 U.S. 19 [57 L.Ed.2d 15, 98 S.Ct. 2151].)

Because of my conclusion on the insufficiency of the evidence, I need not reach any other issues. One further question, however, is of general importance.

Defendant contends that the trial court erred when it rejected his claim of psychotherapist-patient privilege and subsequently admitted testimony as to certain communications he made in confidence to Dr. Judith Hamilton, a clinical psychologist, and Dr. Bellenden Hutcheson, a psychiatrist, in the course of psychotherapy.

The court recognized—rightly—the general applicability of the psychotherapist-patient privilege on the facts presented. Evidence Code section 1014 declares, in pertinent part, that "the patient . . . has a privilege to refuse to disclose, and to prevent another from disclosing, a confidential communication between patient and psychotherapist . . . ."

But the court believed—wrongly—that the so-called "dangerous patient" exception to the psychotherapist-patient privilege was implicated. Evidence Code section 1024 (hereafter section 1024) provides, as relevant here, that "There is no privilege . . . if the psychotherapist has reasonable cause to believe that the patient is in such mental or emotional condition as to be dangerous to himself or to the person or property of another and that disclosure of the communication is necessary to prevent the threatened danger."

The words of section 1024 are clear. The psychotherapist-patient privilege cannot be claimed when the psychotherapist reasonably believes that the patient is dangerous and that disclosure is necessary to avert injury.

---

[1] I recognize that defendant's conduct appears to support an inference of intent to kill. But such an intent, of course, does not amount to or entail premeditation or deliberation in and of itself. (See *People* v. *Anderson, supra,* 70 Cal.2d at p. 26.)

Also clear is the legislative intent underlying section 1024: to prevent future harm. (See § 1024; see also Recommendation Proposing an Evidence Code (Jan. 1965) 7 Cal. Law Revision Com. Rep. (1965) Cal. Law Revision Com. comment, Evid. Code, § 1024, p. 199.)

In view of the foregoing, it is manifest that the trial court erred in rejecting defendant's claim of psychotherapist-patient privilege on the basis of the "dangerous patient" exception.

At the time the privilege was claimed, section 1024 was inapplicable according to the clear meaning of its plain terms. It is undisputed that at that time, neither Dr. Hamilton nor Dr. Hutcheson had any belief, reasonable or otherwise, that defendant was dangerous. It is similarly undisputed that at that time, neither had any belief, reasonable or otherwise, that disclosure of any communication was necessary to avert any injury.

Further, at the time the privilege was claimed, section 1024 was inapplicable because its intent could not be furthered. Again, it is undisputed that at that time, there was no longer any injury that could have been averted. *Cessante ratione legis, cessat et ipsa lex.*

The majority, however, conclude that the trial court did not err. In doing so, they misconstrue section 1024. To begin with, they read the provision contrary to the clear meaning of its plain terms. As noted, section 1024 declares that "There is no privilege . . . if the psychotherapist has reasonable cause to believe that the patient is in such mental or emotional condition as to be dangerous to himself or to the person or property of another and that disclosure of the communication is necessary to prevent the threatened danger." The provision simply does *not* state that "There is no privilege . . . if the psychotherapist *had* reasonable cause to believe that the patient *was* in such mental or emotional condition as to be dangerous to himself or to the person or property of another and that disclosure of the communication *was* necessary to prevent the threatened danger."

Further, the majority interpret section 1024 in violation of the underlying legislative intent. As stated, that purpose was to avert future harm. The majority apparently discern a legislative intent to avert future harm *and to facilitate punishment if the harm is not averted*. But such an intent is not disclosed in the words of the provision or in any relevant extratextual material.

The Legislature could certainly have drafted section 1024 to state the rule the majority now create *ex nihilo*—viz., a "dangerous" communication is outside the scope of the privilege *ab initio*. For example, Evidence Code

section 1018 provides in substance that a "criminal" or "tortious" communication is outside the scope of the privilege: "There is no privilege . . . if the services of the psychotherapist were sought or obtained to enable or aid anyone to commit or plan to commit a crime or a tort or to escape detection or apprehension after the commission of a crime or a tort." But the fact remains that the Legislature did not draft section 1024 to state the new rule created by the majority.[2]

The trial court's error in rejecting defendant's claim of psychotherapist-patient privilege and subsequently admitting the testimony of Drs. Hamilton and Hutcheson as to confidential communications was unquestionably prejudicial. The only arguable basis for speculation as to premeditation and deliberation was laid by that testimony. There is a reasonable probability that absent the error, the outcome would have been more favorable to defendant. (See *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)[3]

For the reasons stated above, I would reverse the judgment in its entirety and bar retrial on the charge of murder in the first degree.

**BROUSSARD, J.**—I dissent.

The majority hold that under Evidence Code section 1024[1] the psychotherapist-patient privilege does not protect against disclosure of communications if: (a) disclosure is necessary to protect the threatened

---

[2] In *People* v. *Clark* (1990) 50 Cal.3d 583, 619-620 [268 Cal.Rptr. 399, 789 P.2d 127], on which the majority rely, the court baldly stated that "If . . . statements [made in confidence] have been revealed to third persons in a communication that is not itself privileged, . . . they are no longer confidential" and no longer privileged. In enacting the Evidence Code, the Legislature rejected the old "eavesdroppers rule." (Recommendation Proposing an Evidence Code, *supra*, 7 Cal. Law Revision Com. Rep., *supra*, Cal. Law Revision Com. comment, Evid. Code, § 954, p. 174 [speaking with specific reference to the attorney-client privilege but with general applicability].) By means of the words quoted above, the *Clark* court attempted to adopt the rule anew. Here, of course, the judiciary cannot resurrect what the Legislature has interred. "[T]he Evidence Code precludes the courts from elaborating upon the statutory scheme" relating to the law of privilege. (Recommendation Proposing an Evidence Code, *supra*, 7 Cal. Law Revision Com. Rep., *supra*, Cal. Law Revision Com. comment, Evid. Code, § 911, p. 160.) A fortiori, it precludes them from subverting the scheme altogether.

The *Clark* statement should be disapproved forthwith. I recognize that *Clark* was decided only a year ago. That fact, however, urges action and not hesitation. "The freshness of error not only deprives it of the respect to which long-established practice is entitled, but also counsels that the opportunity of correction be seized at once, before . . . laws and practices have been adjusted to embody it." (*South Carolina* v. *Gathers* (1989) 490 U.S. 805, 824 [104 L.Ed.2d 876, 892, 109 S.Ct. 2207] (dis. opn. of Scalia, J.).)

[3] Although most of his dissenting opinion is sound, Justice Broussard unfortunately misconstrues section 1024 much as the majority do.

[1] All statutory citations in this opinion are to the Evidence Code.

victim, or (b) disclosure is not itself necessary, but has "triggered" the therapist's decision to warn the victim. I agree with the first part of this holding, which is what section 1024 says. But that is all it says. Extending section 1024 to permit disclosure of communications when that is not and never was necessary to protect the victim amends the statute to reach a result contrary to the intent of the drafters and the enacting Legislature. The majority take pains to reject the extreme interpretations advanced by defendant and amicus curiae—that section 1024 does not apply at trial when the victim is dead, or that it applies only in proceedings undertaken for the benefit of the patient—but never consider that the statute should be applied according to its words, to exclude a communication from the privilege only if its disclosure is or was "necessary to prevent the threatened danger." (§ 1024.)

In the present case, the trial court ruled that defendant's therapists could reveal not only what they told Linda Smith (the murder victim) when they warned her of danger, but also statements made by defendant during therapy which they had not disclosed to Smith. The record here shows that the therapists believed defendant was dangerous, and warned Smith that she was in danger. But they did not reveal anything defendant had told them during therapy, and the prosecution never asserted that such disclosure was necessary to protect Smith. Consequently, under the language and purpose of section 1024, defendant's communications to his therapists retained their privileged character and should not have been admitted into evidence. I conclude that the trial court's ruling was in error, that the testimony as to nondisclosed statements was inadmissible, and that, in view of the slim evidence supporting premeditation, the erroneous admission of this evidence was prejudicial.

I

Prior to trial, the prosecutor brought a motion to determine competency of witnesses, in which he asked the court to determine whether the testimony of the therapists would be admissible under the so-called dangerous patient exception (§ 1024) to the psychotherapist-patient privilege. Defense counsel appeared and asserted the privilege on behalf of his client.

The court examined the therapists in camera. Dr. Judith Hamilton testified that defendant told her that when he had a headache or had been drinking alcohol, he was afraid that he would lose control and hurt Linda Smith. Based on those statements, defendant's use of drugs and alcohol, and his past record of violence, Hamilton decided to warn Smith. Hamilton telephoned Smith and told her that she was in "a dangerous situation." Smith replied, "I know that. I stay with him because I'm lonely and because

he'd kill me if I left." Hamilton and Smith had several further conversations, mostly concerning defendant's hospitalization. Hamilton did not, however, disclose to Smith any communication defendant had made during therapy.

Dr. Bellenden Hutcheson testified that defendant said he had auditory hallucinations which commanded him to kill. He added that he stays away from knives and guns because he might hurt someone. Hutcheson did not plan to warn Smith himself, but relied on Hamilton to do so. Smith, however, called Hutcheson to complain that the medications Hutcheson had prescribed for defendant's headaches were causing defendant to be drowsy; in that conversation Smith told Hutcheson that she was in a difficult and dangerous situation, but was unable to leave. Hutcheson said, "You have to find out how to get out of there," and recommended that Smith get an appointment with Dr. Boutleete, a therapist who had counseled her previously. Hutcheson, like Hamilton, did not disclose to Smith any confidential communication between defendant and himself.

At the conclusion of the in camera proceeding, the court ruled that the following items were not protected by the psychotherapist-patient privilege: "a. All conversations [of the therapists] with Linda Smith; b. The substance of all conversations between Linda Smith and Drs. Hutcheson and Hamilton as they relate to the issue of warnings of threats; c. Impressions and diagnoses which prompted such warnings; d. Statements made by the defendant himself which led to impressions, diagnosis and conclusions by Drs. Hutcheson and Hamilton to warn the victim."[2] Defense counsel raised the specific point I urge in this dissent, namely, that the statute only provided for disclosure "when the disclosure is necessary to prevent the threatened danger." The court, however, replied, "I know the statute could be read to only require the warning, but I don't think that's what the statute means." At trial the therapists testified in accord with their in camera testimony. Defendant objected to portions of the testimony, but not on the ground of privilege, which both sides assumed was settled by the pretrial ruling.[3]

I have no problem with the admissibility of items (a) and (b) in the trial court order, the conversations between victim Linda Smith and the

---

[2] The trial court's order specifically authorized the district attorney to interview the therapists on the listed matters. The ruling, however, necessarily implied that such matters were not privileged, since the district attorney may not ask the therapists to disclose privileged communications. The court's ruling thus signified that the therapists' testimony on such matters would be admissible. The conduct of the parties at trial shows that they understood the ruling as one defining the scope of the psychotherapist-patient privilege in this case for all purposes, including admissibility of evidence.

[3] I agree with the majority that this pretrial ruling is reviewable under *People v. Morris, ante,* 152, at page 190 [279 Cal.Rptr. 720, 807 P.2d 949], even though the judge who rendered the ruling was not the judge who ultimately tried the case.

therapists. The admissibility of such conversations was decided in *People* v. *Clark* (1990) 50 Cal.3d 583, 619 [268 Cal.Rptr. 399, 789 P.2d 127]. But I submit that the court erred in holding items (c) and (d) admissible. Given the balance of evidence in this case, the error was prejudicial.[4]

## II

My analysis of the meaning of section 1024 begins with the statutory language. " 'The court turns first to the words themselves for the answer.' " (*Brown* v. *Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 724 [257 Cal.Rptr. 708, 771 P.2d 406]; *Delaney* v. *Superior Court* (1990) 50 Cal.3d 785, 798 [268 Cal.Rptr. 753, 789 P.2d 934].) "If the language is clear and unambiguous there is no need for construction . . . ." (*Lungren* v. *Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299].)

All confidential communications between a patient and his therapist are privileged (§ 1014) unless they lose that character by virtue of some specific exception in the Evidence Code. The only relevant exception here is section 1024, which states: "There is no privilege under this article if the psychotherapist has reasonable cause to believe that the patient is in such mental or emotional condition as to be dangerous to himself or to the person or property of another and that disclosure of the communication is necessary to prevent the threatened danger." Under this language, each communication between the therapist and the patient[5] retains its privileged status until two conditions are met. First, the therapist must have reasonable cause to believe the patient is in such mental or emotional condition as to be dangerous to himself or to others. Second, the therapist must have reasonable cause to believe that disclosure of the communication is necessary to prevent the threatened danger.

The second condition is at issue here. There is no ambiguity concerning its requirements. A communication is privileged unless its disclosure is

---

[4] The majority approach this issue in a circuitous fashion. They first assert that defendant waived the psychotherapist-patient privilege by putting his mental state in issue. They then recognize defendant's claim that this waiver was coerced by the court's pretrial ruling on the scope of the dangerous patient exception. The majority reply that this ruling was correct, so the waiver was not coerced by an erroneous ruling. They then discuss the merits of that ruling at length. Thus the majority's conclusion ultimately rests not on the waiver, which may have been the product of the pretrial ruling, but on the correctness of that ruling itself.

All this unnecessarily complicates the matter. It would be simpler—and amount to the same thing—to say that the issue of the pretrial ruling on privilege is properly before us on appeal because subsequent acts of defense counsel in response to that ruling did not waive the issue.

[5] The term "communication" as used in section 1024 and throughout the psychotherapist-patient privilege refers to the communication between the therapist and the patient (see § 1014), not to the communication, if any, between the therapist and the victim.

necessary to prevent threatened danger. A communication does not lose its privileged status merely because the therapist has reasonable cause to believe that the patient is dangerous, or because the communication may contribute to the therapist's conclusion that he or she should take some action to prevent danger—so long as that action does not itself require disclosure of the communication in question.

The record here revealed that when Dr. Hamilton called Linda Smith and told her she was in a dangerous situation, she replied, "I know." Smith later called Dr. Hutcheson and volunteered that she knew she was in danger. Under these circumstances, neither therapist had reasonable cause to be believe that she or he must divulge further confidential communications to Smith, and neither did so.[6] Thus under the plain meaning of the statute, none of those communications lost their privileged status.

### III

The foregoing interpretation of section 1024 is supported by the history of the psychotherapist-patient privilege and the cases applying that privilege.

The Law Revision Commission comment to section 1014, which creates the psychotherapist-patient privilege, explained that "[a] broad privilege should apply to both psychiatrists and certified psychologists. Psychoanalysis and psychotherapy are dependent upon the fullest revelation of the most intimate and embarrassing details of the patient's life. Research on mental or emotional problems requires similar disclosure. Unless a patient or research subject is assured that such information can and will be held in utmost confidence, he will be reluctant to make the full disclosure upon which diagnosis and treatment or complete and accurate research depends. [¶] The Law Revision Commission has received several reliable reports that persons in need of treatment sometimes refuse such treatment from psychiatrists because the confidentiality of their communications cannot be assured under existing law. *Many of these persons are seriously disturbed and constitute threats to other persons in the community.*" (Italics added.) The Law Revision Commission went on to explain that the "difference in the scope of the two privileges [the psychotherapist-patient privilege as compared to the

---

[6]Defendant contends that the therapists did not disclose any confidential communication to Smith. The majority reply that a communication, as defined in section 1012, includes "information obtained by an examination of the patient" and "a diagnosis." Arguably the therapist's conclusion that defendant was a danger to Smith is a "communication" within the meaning of that section. The majority acknowledge, however, that the fact that one communication is nonprivileged by operation of section 1024 does not deprive other confidential communications of the privilege. (Maj. opn., *ante*, p. 554.)

physician-patient privilege, which does not apply in criminal proceedings] is based on the fact that the Law Revision Commission has been advised that proper psychotherapy often is denied a patient solely because he will not talk freely to a psychotherapist *for fear that the latter may be compelled in a criminal proceeding to reveal what he has been told*." (Italics added.)

I have emphasized certain parts of the Law Revision Commission comments to make it clear that the privilege was intended to apply—indeed was written specifically—*to protect the patient who is a "threat to other persons in the community" and fears disclosure in a criminal proceeding*. Thus the provisions defining the privilege and the exceptions to that privilege should be interpreted to encourage potentially dangerous persons to seek psychotherapy by providing them with protection against the disclosure of their confidences in subsequent criminal proceedings.[7]

The Law Revision Commission also explained the reason for the dangerous patient exception of section 1024: "it is essential that appropriate action be taken if the psychotherapist becomes convinced during the course of treatment that the patient is a menace to himself or others and the patient refuses to permit the psychotherapist to make the disclosure necessary to prevent the threatened danger." In other words, the primary purpose of section 1024 is to enable the therapist to disclose communications when the therapist thinks disclosure is necessary, not to compel the therapist to make disclosures he or she considers unnecessary. To require disclosure beyond the necessities of the case would be inconsistent with the legislative purpose.

In light of the purposes served by the psychotherapist-patient privilege, the cases have consistently held that any doubt should be resolved in favor of the privilege. "[T]he statutory psychotherapist-patient privilege 'is to be liberally construed in favor of the patient.' " (*In re Lifschutz* (1970) 2 Cal.3d 415, 437 [85 Cal.Rptr. 829, 467 P.2d 557, 44 A.L.R.3d 1]; *Roberts* v. *Superior Court* (1973) 9 Cal.3d 330, 337 [107 Cal.Rptr. 309, 508 P.2d 309].) "[E]ven when the balance tips in favor of disclosure, constitutional concerns require a strict circumscription of the scope of the disclosure." (*Cutter* v. *Brownbridge* (1986) 183 Cal.App.3d 836, 843 [228 Cal.Rptr. 545].) Thus the courts have an "obligation to construe narrowly any exception to the

---

[7] The majority reject concerns that their interpretation will discourage potentially dangerous persons from seeking mental health counseling on the ground that in *Tarasoff* v. *Regents of University of California* (1976) 17 Cal.3d 425, 440, footnote 12 [131 Cal.Rptr. 14, 551 P.2d 334, 83 A.L.R.3d 1166], we said such predictions are speculative. And so they are—we have no data. But it is clear that they were a matter of concern to the Law Revision Commission and the Legislature. If the Legislature drafted section 1024 narrowly because of its concern for the risk that a broad exemption would deter persons from seeking therapy, we have no warrant to brand the Legislature's concern "speculative" and adopt an interpretation contrary to its intent.

psychotherapist-patient privilege: we must apply such an exception only when the patient's case falls squarely within its ambit." (*People* v. *Stritzinger* (1983) 34 Cal.3d 505, 513 [194 Cal.Rptr. 431, 668 P.2d 738].)

*Tarasoff* v. *Regents of University of California, supra*, 17 Cal.3d 425, the leading case discussing a therapist's duties with respect to a dangerous patient, held that the heirs of a murder victim could bring a wrongful death action against the therapists who failed to warn the victim. In reaching this result, we described the Evidence Code provisions as "balancing the countervailing concerns" by establishing a "broad rule of privilege to protect confidential communications between patient and psychotherapist" in section 1014 and a "specific and limited exception" in section 1024. (17 Cal.3d at pp. 440-441.) We then said: "We realize that the open and confidential character of psychotherapeutic dialogue encourages patients to express threats of violence, few of which are ever executed. Certainly a therapist should not be encouraged routinely to reveal such threats; such disclosures could seriously disrupt the patient's relationship with his therapist and with the persons threatened. To the contrary, the therapist's obligation to his patient requires that he not disclose a confidence unless such disclosure is necessary to avert danger to others, and even then that he do so discreetly, and in a fashion that would preserve the privacy of his patient to the fullest extent compatible with the prevention of the threatened danger." (P. 441.)[8] How can a therapist fulfill this obligation under the majority's view? They hold that even if the therapist carefully tells the victim only what she needs to know for her own safety—that she is in danger—by that act the therapist has destroyed the client's privilege as to all communications which led to the conclusion that the client was dangerous, and that a warning was necessary.

Subsequent to *Tarasoff*, the Legislature added subdivision (s) to Welfare and Institutions Code section 5328, which relates to records of involuntarily committed mental patients. It provides that "[w]hen the patient, in the opinion of his or her psychotherapist, presents a serious danger of violence to a reasonably foreseeable victim or victims, then any of the information or records specified in this section may be released to that person or persons and to law enforcement agencies as the psychotherapist determines is needed for the protections of that person or persons." Section 5328 confirms the legislative intent to limit disclosure to that which is *needed* for protection of the victim.

---

[8]The majority maintain that the quoted language from *Tarasoff* describes only the common law duty of the therapist to his or her patient and to the potential victim. I believe it was also intended to describe the balance struck by the Legislature between privilege and disclosure, a balance that the *Tarasoff* court believed was completely consistent with the common law rule.

Our recent decision in *People* v. *Clark, supra,* 50 Cal.3d 583, declared that "[a] psychotherapist has a professional duty to maintain the confidential character of communications made to him by his patient during the course of the relationship, but when it is necessary to disclose confidential information to avert danger to others the therapist must do so. [Citing *Tarasoff.*] . . . [Section 1014] exists to prevent the unnecessary disclosure of statements made in confidence in the course of a privileged communication with a therapist and thereby to facilitate treatment. . . . If the statements have been revealed to third persons in a communication that is not itself privileged, however, they are no longer confidential."(Pp. 619-620.) Again we find language carefully limiting section 1024 to statements which it is *necessary* to disclose; nothing in *Clark* would support disclosure of statements which the therapist did not reveal and did not need to reveal to the victim.

The Court of Appeal decisions cited by the majority do not detract from the foregoing analysis, but turn on other issues. In *People* v. *Gomez* (1982) 134 Cal.App.3d 874 [185 Cal.Rptr. 155], the defendant argued at trial that section 1024 was inapplicable since the victim was dead and disclosure would no longer serve the purpose of preventing danger. The Court of Appeal held that if disclosure was necessary when the communications were disclosed in an effort to prevent danger, the communications were not privileged. I agree; under section 1024, once circumstances require disclosure to prevent danger, the communications which have been disclosed lose their privileged character, and do not later regain that status. But nothing in *Gomez* removes the privilege from communications which were not disclosed and did not need to be disclosed to prevent danger.

*Mavroudis* v. *Superior Court* (1980) 102 Cal.App.3d 594 [162 Cal.Rptr. 724], concerned discovery in a civil suit alleging failure to warn. The court held that if the preliminary facts required by section 1024 were present at the time of the injury, the claim of privilege fails, even though by time of trial it was too late to prevent the danger. The court then established a procedure for in camera review of the psychiatric records to determine what should have been disclosed, and thus is subject to discovery. Nothing in that case suggests that the plaintiff was entitled to discover confidential communications whose disclosure was never necessary to prevent danger.

In sum, a communication does not lose its privilege because it influenced a therapist to take some action *other than disclosure of that communication* to prevent danger. Under the language of section 1024, the Law Revision Commission comments to that section, and the subsequent cases and enactments, a communication loses the protection of the psychotherapist patient privilege only when disclosure of that communication is itself necessary to

prevent danger. Since none of defendant's communications during therapy were disclosed to victim Smith, and the prosecution offered no showing that such disclosure was ever necessary to prevent danger, the trial court erred in ruling that these communications were not protected by the psychotherapist-patient privilege.

## IV

Without the testimony concerning defendant's statements during therapy, the evidence that defendant premeditated the killing is extremely scanty. That evidence can be summarized briefly: (1) Smith was probably killed with a hammer; (2) defendant sold some of the victim's belongings after she died; (3) the victim once wrongly suspected defendant of stealing her car; and (4) the therapists told the victim that she was in danger.[9]

None of this proves very much. The prosecutor argued that defendant might have taken a hammer from the tool box in anticipation of a quarrel, or, inconsistently, that defendant went to the toolbox to get it after he became angry—but both hypotheses are merely conjecture on the prosecutor's part. The use of a hammer, a common household tool, instead of a gun or other weapon designed to kill, suggests absence of premeditation. The proof that defendant hid the hammer after the killing adds nothing.

The evidence of motive, based on defendant's thefts and Smith's suspicion of those thefts, is weak, and proof of motive alone will not sustain a finding of premeditation. (*People* v. *Anderson* (1968) 70 Cal.2d 15, 27 [73 Cal.Rptr. 550, 447 P.2d 942].) The fact that defendant sought therapy shows not that he was planning to kill, but that he feared he would kill impulsively and sought help to prevent that from happening. The therapists' warning is fully consistent with the fact that defendant was a disturbed, violent person with poor impulse control, i.e., the kind of person likely to commit an unpremeditated killing.

The evidence of defendant's undisclosed communications to the therapists added greatly to the weight of the prosecution case. As the prosecutor said, "the things that Mr. Wharton says himself to his psychiatrist [are] much more important" than the other evidence. The prosecutor explained the importance of this evidence to the jury: "Now, how many homicide cases do you have where you have a statement a defendant makes two weeks ahead of time when you're trying to prove premeditation and

---

[9]The Attorney General also argues in support of premeditation that the evidence showed that defendant knew he was hitting, and perhaps killing, the victim. But intent to kill and knowledge that one is killing are fully consistent with unpremeditated murder. A lack of intent or knowledge would suggest absence of malice, reducing the crime to manslaughter.

deliberation? How many times do you think you have a case where someone tells his shrink, two weeks ahead of time, they're thinking of hurting the person they end up murdering? Premeditation and deliberation requires you to have think [*sic*] about what you're doing. Well, at least from the 27th he was thinking about it. . . . [T]his is strong, strong evidence of premeditation and deliberation. He's thinking about it, knows he has a problem along these lines, he's thinking about it two weeks ahead of time."

The evidence of defendant's communications, fully exploited by the prosecutor, greatly strengthened what otherwise would have been a weak case for premeditation—one based largely on conjecture. Without such evidence I believe it reasonably probable that the jury would not have found the defendant committed a premeditated murder. Applying the test of prejudice of *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243], I would reverse the judgment finding defendant guilty of first degree murder, and remand the case for a new trial.

Kennard, J., concurred.

The petition of respondent Wharton for a rehearing was denied July 9, 1991, and the opinion was modified to read as printed above. Mosk, J., Broussard, J., and Kennard, J., were of the opinion that the petition should be granted.